# IN RE RYAN R.*
## (AC 26946)
## (AC 26947)

Bishop, McLachlan and Gruendel, Js.

Argued February 9—officially released July 24, 2007

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Trudy Condio*, for the appellant (minor child).

*Roseann C. Canny*, for the appellant (respondent mother).

*Tammy Nguyen-O'Dowd*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Opinion*

GRUENDEL, J. The respondent mother[1] and her minor child, R, appeal from the judgment of the trial court terminating the respondent's parental rights with respect to R. On appeal, the respondent claims that the court improperly found that (1) the department of children and families (department) provided reasonable efforts to reunify her with R and that she was unable or unwilling to benefit from reunification efforts, and (2) she failed to achieve a sufficient degree of personal rehabilitation. In addition, both the respondent and R claim that the court improperly concluded that (3) it

---

[1] The petition was withdrawn as against the respondent father. We refer in this opinion to the respondent mother as the respondent.

was in R's best interest to terminate the parental rights of the respondent.[2] We affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. The respondent had been involved with the department since 1995 due to her extensive substance abuse, domestic violence and unaddressed mental health issues. While incarcerated at York Correctional Institution in 2000, the respondent discovered that she was pregnant with R.[3] After her release on bond, in May, 2001, the respondent married J, the father of two children to whom she had given birth previously.[4]

---

[2] On October 26, 2006, the attorney for the child filed a letter with this court in which she stated: "Pursuant to [Practice Book] § 67-13, counsel for [R] submits this statement that the child *does not* adopt the briefs of either party. Instead, counsel for the minor child filed an appeal on behalf of [R], alleging that the trial court erred in concluding that termination of parental rights was in the best interest of the child." (Emphasis in original.)

Although our jurisprudence has not had the opportunity to decide whether a child properly may appeal from the termination of parental rights, our Supreme Court recently held that "[i]n cases involving parental rights, the rights of the child coexist and are intertwined with those of the parent. The legal disposition of the parent's rights with respect to the child necessarily affects and alters the rights of the child with respect to his or her parent." (Internal quotation marks omitted.) *In re Christina M.*, 280 Conn. 474, 486–87, 908 A.2d 1073 (2006), quoting *Wright* v. *Alexandria Division of Social Services*, 16 Va. App. 821, 825, 433 S.E.2d 500 (1993) (child "has a 'personal stake in the outcome' of the proceeding to terminate her mother's parental rights and, therefore, has standing to challenge the propriety of the trial judge's decision to terminate those rights"), cert. denied, 513 U.S. 1050, 115 S. Ct. 651, 130 L. Ed. 2d 555 (1994).

In light of our Supreme Court's determination that the rights of the parents in a termination of parental rights proceeding are "inextricably intertwined with those of their children"; *In re Christina M.*, supra, 280 Conn. 487; we consider the child's claim independently. Because the claim on appeal also is raised by the respondent mother, however, it is not necessary to decide whether the child is a party to the underlying termination of parental rights case; see *Knock* v. *Knock*, 224 Conn. 776, 777 n.1, 621 A.2d 267 (1993); and we consider both claims together in part III.

[3] The respondent originally told the department that her pregnancy was the result of a sexual assault and that she did not know the identity of the father. At trial, the respondent testified that she had stated that she had been raped in order to obtain a medical card.

[4] The respondent had had an intermittent relationship with J for ten years. J is not, however, R's biological father.

She gave birth to R on July 26, 2001. The respondent's parental rights with respect to the two older children were terminated on September 25, 2001, with her consent. On October 29, 2001, the petitioner, the commissioner of children and families (commissioner), filed a neglect petition with respect to R, which was withdrawn on March 28, 2002.

On August 27 and 28, 2002, the respondent admitted to a department investigator that J had broken her arm and beaten her all over her body. She reported significant incidents of domestic violence during the preceding several months.[5] On August 28, 2002, the commissioner invoked a ninety-six hour administrative hold pursuant to General Statutes § 17a-101g and took R into custody, suspecting drug use in the home and domestic violence between the respondent and J. Two days later, the commissioner filed an ex parte motion for an order of temporary custody and a second neglect petition that alleged that R "was living under conditions and circumstances injurious to his well-being."[6] The

[5] On August 30, 2002, Michael Clark, the department investigator, issued an affidavit in which he documented information given by the respondent, which stated that she "indicated that [J] has a history of drug use and is presently 'popping pills' and selling them on the street. [She] discussed the extensive history of domestic violence between [her] and [J]. The investigator noticed [the respondent's] right wrist was injured and wrapped with an [A]ce bandage. [He] questioned [the respondent] about the injury and she initially refused to answer. Later in the interview . . . she stated [that J] broke her arm and beat her all over. However, she refused to elaborate. She reported at the time [that] her son was in her apartment with her upstairs neighbor . . . . [The respondent] also indicated, while she was in the parking lot at the . . . police department, [that J] called and threatened to kill her. . . . [The respondent] indicated [that] she was afraid to give a statement [to the police] as she was afraid [J] would harm her." Clark's affidavit also documented the respondent's account of incidents in which J forcefully removed a telephone from her hand and "attempted to hit her with it and smashed it against the wall," pushed her down stairs, jumped on the hood of her car while R was in it, and often beat her and then told her that he loved her.

[6] Specifically, the commissioner's second neglect petition alleged that the parents had "an extensive history" with the department, including substance abuse and unresolved issues of domestic violence, which negatively

court, *Harleston, J.*, denied the ex parte motion and granted the commissioner a show cause hearing. On December 16, 2002, the parties reached an agreement under which the respondent entered a plea of nolo contendere; the child was adjudicated neglected and placed under an order of protective supervision with the respondent for a period of six months. During the period of protective supervision, the department referred the respondent for evaluations for substance abuse treatment at New Directions of North Central Connecticut (New Directions) and for mental health services at North Central Counseling Services. Neither agency recommended additional treatment for the respondent.

On or around April 11, 2003, the department received notice from the Southington police department that the respondent had been arrested and charged with attempting to steal videotapes from a store and that a child fitting R's description was present when she was arrested. On April 25, 2003, the commissioner again filed a motion for an order of temporary custody because she was unable to locate either the respondent or R. On April 28, 2003, the commissioner moved to have the protective supervision modified to commitment. After the respondent and R were located at a motel in West Springfield, Massachusetts,[7] R again was taken from his mother. On May 2, 2003, the court sustained the order of temporary custody by agreement, and the order of protective supervision was extended to December 16, 2003. The court ordered the respondent to comply with specific steps, which included individual therapy, cooperation with in-home services, submission to substance

impacted their ability to provide appropriate care to R; the respondent minimized the impact that domestic violence had on R; and R had specialized needs in that he was an infant and had been exposed to unsafe conditions in the family home.

[7] The respondent admitted to the department that she had been hiding because she knew the commissioner would remove R from her care.

abuse assessment, successful completion of substance abuse treatment and submission to random drug testing. In addition, it ordered her to keep R's and her own whereabouts known to the department, to keep all appointments that the department would arrange, to have no further involvement with the criminal justice system and to have no new arrests.

Following the removal, the department discussed with the respondent the possibility of her admitting herself to an inpatient substance abuse treatment program, but she told the department that she could not do so because she needed to work and save money.[8] The department referred her to the Genesis Center for a substance abuse evaluation, during which the respondent admitted to a history of crack cocaine use that at times would cost her $1000 per day. She also reported extensive periods of abstinence and incidents of relapse. During the periods of relapse, multiple larceny charges were brought against her that were a result of her cocaine addiction. The Genesis Center recommended an intensive outpatient treatment program for the respondent because she had exhibited success from lower levels of care in the past. The director of substance abuse services there testified that medical detoxification was not necessary because crack cocaine caused psychological and not physical drug dependence.

The Genesis Center also referred the respondent to the Alcohol and Drug Recovery Center (recovery center), an outpatient substance abuse treatment program, where she was assessed on June 3, 2003. The recovery

---

[8] The respondent informed the department that she would consider an inpatient facility in the future if R would be placed with her in the program. She was instructed that the department needed "a substantial period of sobriety first before [it] could consider placing [R] with [the respondent] in a residential treatment program."

center consisted of intensive outpatient, relapse prevention and aftercare programs. It was recommended that the respondent participate in the intensive outpatient program, which she successfully completed. On July 23, 2003, she entered the relapse prevention program, which she completed as well. The respondent also received mental health services through anger management and psychotherapy, and her counselor testified that the respondent was insightful during these sessions and that it was not necessary for her to engage in a more intensive form of treatment.

Despite initial success at the recovery center, the respondent was unable to remain abstinent. She tested positive for opiates and cocaine in June and August, 2003, and failed to submit urine screens in August and September, 2003. On September 15, 2003, the recovery center wrote a letter to the respondent, indicating that it was going to discharge her from the program due to her positive urine screens and lack of contact. The recovery center recommended a higher level of treatment for the respondent, namely, an inpatient substance abuse treatment program. Both the recovery center and the department provided the respondent with an extensive list of the telephone numbers of inpatient substance abuse treatment programs, and the recovery center additionally advised her regarding the manner in which she could admit herself into such a program. On September 16, 2003, at a case status conference, the respondent indicated to the department that she would call to arrange for inpatient treatment. The respondent failed to call. On February 25 and 26, 2004, the respondent was evaluated by Nancy Randall, a clinical psychologist with East Lyme Psychological Associates. Randall described the respondent as a woman with long-standing substance abuse issues for which she requires significant treatment. Despite having been through a number

of programs, the respondent had been unable to maintain long-term recovery. Randall believed that, although her risk for relapse likely was to be high for some time, the respondent was in need of inpatient treatment and long-term aftercare.

The record reveals that the respondent had been arrested in excess of fifty times for crimes of larceny, forgery, harassment and for violation of probation, among other charges. In addition, the respondent failed to keep the department informed of her whereabouts and, despite initial regular attendance at the department's arranged visits with R, began to miss visits during September and October, 2003. By November, 2003, the respondent ceased visitation without informing the department. After unsuccessful attempts to contact the respondent, the department was informed by the Enfield police department that she had been arrested and charged with shoplifting and was incarcerated. During trial, the respondent was incarcerated for having committed insurance fraud, and her maximum release date was set at June 11, 2008.[9]

[9] In its memorandum of decision, the court acknowledged the various programs that the respondent successfully completed while incarcerated: "[The respondent] has completed the Marilyn Baker substance abuse program, although it took her longer than usual. She received a certificate of successful completion on February 3, 2005 . . . . She also became a peer mentor in the Marilyn Baker Program. While incarcerated, she did lose some privileges and was disciplined [on] April 8, 1999, and September 24, 2004.

"In addition to the Marilyn Baker Program, [the respondent] also received the following: a certificate of achievement for [the] Tier I program (six hours) on April 29, 1999 . . . Certificate of Appreciation in recognition of valuable contributions to the Parenting Skill Program on May 14, 2004 . . . a Certificate of Recognition for completing People Empowering People Program on December 13, 2004 . . . a certificate for successful completion of an eight week elective introduction to 12 Steps Recovery, Marilyn Baker . . . Program, Tier IV . . . certificate for successful completion [of] a six week elective on anger management in the Marilyn Baker Program on February 15, 2005 . . . and a letter of completion from the chaplain at York Correctional Institution in an elective course on 'Spirituality.' " The respondent completed these programs under various names.

R's biological father, B, was not apprised of R's existence until the respondent filed a claim for child support in October, 2002. Paternity was established in December, 2002, and B began paying child support in May, 2003. On December 1, 2003, the commissioner filed a petition to terminate the parental rights of B and the respondent, alleging failure to achieve a sufficient degree of personal rehabilitation as to both the respondent and B, as well as abandonment and no ongoing parent-child relationship as to B. R's paternal aunt, T, was first made aware of R when child support papers were sent to her house in August, 2003. After a discussion with her brother, T attempted to initiate supervised visits with R, which finally began in February, 2004. From the beginning, T, a peer mediation counselor in the public schools, wanted to take R from the custody of the commissioner and bring him to her home, which she shared with her mother and father. On February 9, 2004, the commissioner filed a permanency plan in which termination of parental rights and adoption were recommended. On March 17, 2004, the commissioner withdrew the termination petition as to B, and on March 26, 2004, the respondent filed a motion to transfer guardianship from the biological parents to T. On May 12, 2004, R was transferred to T's home.

The court, *Crawford, J.,* consolidated for trial the respondent's motion to transfer guardianship with the commissioner's petition for termination of parental rights. Seven days of testimony to the court commenced on December 14, 2004, and continued for more than four months. The commissioner, the respondent, R and B all were represented by counsel at trial. The respondent and the commissioner each presented numerous witnesses, and the respondent testified on her own behalf. On August 9, 2005, the court issued a thorough memorandum of decision in which it appointed T as

guardian for R and terminated the parental rights of the respondent. These appeals followed.[10]

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. . . . A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under General Statutes § 17a-112 (j)][11] exists by clear and convincing evidence.

[10] The respondent filed motions to clarify or correct the court's memorandum of decision. Her motions for review were granted by this court, as was the relief requested therein. The trial court appropriately rectified the memorandum of decision and redacted any reference to an exhibit that had not been admitted as a full exhibit at trial.

[11] General Statutes (Rev. to 2003) § 17a-112 (j) provides in relevant part: "The Superior Court, upon hearing and notice as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . (2) that termination is in the best interest of the child, and (3) that . . . (B) the child . . . (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief

If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Jermaine S.*, 86 Conn. App. 819, 826–27, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005).

I

The respondent first claims that the court improperly concluded that the department provided reasonable efforts to reunify her with her child. In addition, she claims that the court improperly found that she was unable or unwilling to benefit from reunification efforts. We disagree.

General Statutes (Rev. to 2003) § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . ." "Section 17-112 (j) makes clear that the court must make a finding based on clear and convincing evidence that the department made reasonable efforts at reunification *or, in the alternative,* make a finding that the parent is unwilling or unable to benefit from reunification efforts." (Emphasis added.) *In re Alexander T.*, 81 Conn. App. 668, 672, 841 A.2d 274, cert. denied, 268 Conn. 924, 848 A.2d 472 (2004). As in *In re Alexander T.*, the court in this case decided both issues.

that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

We first address the respondent's claim that the department's efforts at reunification were not reasonable. "It is axiomatic that in seeking to terminate parental rights, the commissioner must prove by clear and convincing evidence that the department made reasonable efforts to reunify the parent and child as required by [General Statutes] § 17a-112 [j] (1). . . . Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Citation omitted; internal quotation marks omitted.) *In re Destiny D.*, 86 Conn. App. 77, 82, 859 A.2d 873, cert. denied, 272 Conn. 911, 863 A.2d 702 (2004).

A careful review of the record reveals that there was adequate evidence for the court to have concluded that the department made reasonable efforts to reunify the respondent with R. The court's thorough memorandum of decision delineates the department's efforts at reunification. It described the efforts made subsequent to R's first removal on August 28, 2002, including a referral to Advanced Behavioral Health, the respondent's intake at North Central Counseling Services and an evaluation at New Directions. "On September 25, 2002, [the respondent] presented for her intake at North Central Counseling Services. She reported a history of domestic violence, emotional abuse and ongoing verbal abuse. She denied any physical abuse. . . . The evaluator

diagnosed cocaine dependence, but found [the respondent] to be in full remission based on the information [she] provided. [The respondent] was not seeking treatment at that time. . . .

"On October 1, 2002, [the respondent] was again evaluated at New Directions. Her hair test and urine screens came back negative. The report noted that she had previously received comprehensive services, including day treatment programming, intensive day treatment, family treatment, couples counseling and individual counseling. New Directions recommended that she become involved in community support such as Narcotics Anonymous or [a] parents' group. No additional treatment for drug addiction was recommended at this time because of the extensive work completed less than one year earlier." (Citation omitted.)

After R was taken from the respondent for the second time, the department made another referral to Genesis Center for a substance abuse evaluation and urine drug screen, with which she at first failed to comply.[12] On June 2, 2003, Stephanie Cohen of the recovery center determined that, due to her long history of cocaine dependency and unaddressed extensive trauma, the respondent was in desperate need of a change in her recovery plan. The respondent began an intensive outpatient substance abuse treatment program at the recovery center on June, 5, 2003, and was then referred to a relapse prevention group.[13] Despite consistently having informed the department that she had been

---

[12] The trial court's compliance with an order from this court; see footnote 9; documents that "[the respondent] did return the next day, May 6, 2003, and had a drug screen. On May 6, 2003, [the respondent] had also reported that the night before . . . she had one drink mixed with vodka. After a car accident, she had previously been prescribed [Vicodin] for the pain, on and off, and her last use was in October or November, 2002."

[13] The court noted that the respondent "tested positive for codeine on June 12, 2003, and June 26, 2003. She failed to produce the prescription or the bottle to the program or [the department]."

attending the program, the respondent now claims that her missed sessions were due to its failure to provide her with transportation. After failing to appear for drug screens in August and September, 2003, she was discharged from the relapse program. The department provided the respondent with a list of sixty-two inpatient substance abuse treatment programs, but she failed to contact any of them.

The respondent claims in her brief, as she did during trial, that the department's efforts were unreasonable because the department did not provide her with individual counseling, refer her to an inpatient facility and provide her with transportation to the outpatient facility. As the court noted, "Cohen, on June 2, 2003, recommended individual counseling to begin *after* [the respondent] completed intensive outpatient substance abuse treatment." (Emphasis added.) Although the respondent did complete an intensive outpatient program on July 16, 2003, the next level of care was relapse prevention, which she "started on July 23, 2003, and attended nine sessions. She then failed to return. She had submitted ten urine screens, two of which were positive for heroin and three for cocaine. She did not maintain abstinence, which was the primary treatment goal, and she was then referred for intensive outpatient treatment." The respondent's psychiatrist stated that counseling has no impact on substance abuse, and Randall believed that individual therapy probably would do little to address her underlying personality disorder. Although she initially requested transportation to the outpatient program, the department informed her that transportation would not always be available. As previously noted, the respondent told the department that she had been attending the program consistently.

Although the respondent initially was consistent with her visitation, she began missing visits with R that had been arranged by the department in September and

October, 2003. By November, 2003, the respondent ceased visits altogether without informing the department. In all instances, and considering the various programs to which the respondent was referred, the court's finding by clear and convincing evidence that the department had made the requisite reasonable efforts to reunite her with R was not clearly erroneous. As previously noted: "[R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Destiny D.*, supra, 86 Conn. App. 82.[14]

The respondent further claims that the court improperly found that she was unable or unwilling to benefit from reunification efforts. See General Statutes § 17a-112 (j) (1). This claim warrants little additional discussion. The court found that the respondent "has not acknowledged her responsibility for her continued drug use, [has] continued to be involved in criminal activity and continued to relapse. She chose crack cocaine over her child." The record reveals the respondent's extensive history with the department and her inability or unwillingness to benefit from the department's efforts at reunification. In addition to her positive urine screens and missed classes, the respondent has admittedly relapsed and failed to honor many of the specific steps that the court had ordered prior to the petition for the termination of parental rights. She also missed several

---

[14] The court also cites two cases in which efforts decidedly less comprehensive than those exercised in the present case were nevertheless deemed reasonable. See *In re Alexander T.*, supra, 81 Conn. App. 673, ("[i]n light of the entire record, the failure to provide the referral, while a lapse, does not make the overall efforts of the department fall below the level of what is reasonable"); *In re Ebony H.*, 68 Conn. App. 342, 350, 789 A.2d 1158 (2002) ("[n]otwithstanding the court's finding that the department's response to the respondent's request for assistance in obtaining housing was shameful and unacceptable, our review of the evidence admitted at the trial does not leave us with a definite and firm conviction that the court mistakenly found that the department had made reasonable efforts to reunify the respondent and the child").

visits with R that had been arranged by the department. The court's finding that there was clear and convincing evidence to show that the respondent was unwilling or unable to benefit from reunification efforts was not clearly erroneous.

II

The respondent next claims that the court improperly concluded that the commissioner proved by clear and convincing evidence that she failed to achieve a sufficient degree of personal rehabilitation. We disagree.

General Statutes (Rev. to 2003) § 17a-112 (j) (3) (B) (ii) delineates an alternate means for the court to terminate parental rights. It provides in relevant part that parental rights may be terminated if the child "is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation

she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873 (1999).

The evidence credited by the court supports its findings that the respondent had been referred to a number of services dating from 1994 and that she "continued periodically to test positive for drugs, failed to show for appointments with service providers and failed to follow through on referral for counseling." It described her "extensive substance abuse history with cocaine as her drug of choice," as well as her extensive criminal history.[15] The court reasonably relied on the testimony of expert witnesses. Randall testified that the respondent had a personality disorder and that "she has a high likelihood of substance abuse problems, of having conflicts with the law." She concluded that "if she was to resume care of her son when she came out of prison, I would be concerned about her ability to prove—provide safety for him so that he wouldn't be either witnessing violence in her home or be subject to violence in the home. So, I—I did not see her as being close to being able to provide care for him." Randall did not believe that the respondent could achieve rehabilitation sufficiently within a reasonable amount of time for a three year old child.[16]

---

[15] The court stated: "[The respondent] has had a drug addiction problem for approximately fifteen to twenty years. She has also had a problem with being in relationships where she has been abused, and she has an extensive criminal history which started in 1984. She has been arrested thirty-three times on multiple counts and has at least forty convictions. These range from larceny, false statement, insurance fraud, harassment, narcotics, violations of probation and manslaughter. Her history spans three states, Massachusetts, New Hampshire and Connecticut."

[16] Randall testified that there were two issues to consider: "One of them is, is the mother likely to get her act together within a reasonable period of time and . . . I think I've testified that I don't believe that she can do that within a reasonable period of time. We were talking about a possibility

The court recognized the programs that the respondent successfully completed while incarcerated, but found in its memorandum of decision that "[o]ver the years, [the department] has provided extensive services to [the respondent]. She has a twenty year history of substance abuse, relapse and domestic violence. Her need of extensive treatment, and failure to recognize and address some trauma issues, leads one to conclude that she cannot be restored within a reasonable period of time to a responsible and constructive role in [R's] life." Accordingly, we conclude that the court's finding by clear and convincing evidence that the respondent had failed to achieve a degree of rehabilitation as would encourage the belief that within a reasonable period of time she could assume a responsible position in R's life was not clearly erroneous.

## III

The respondent and R both claim that the court improperly concluded, in the dispositional phase of the hearing, that it was in the child's best interest to terminate the parental rights of the respondent with respect to R. We disagree.

"The best interests of the child include the child's interests in sustained growth, development, well-being,

---

of three years as a minimum before she would be prepared to . . . work toward reunification. I think that's too long for a child who's three years old and who hasn't been with his mother since he was—I think before two years old—taken out of the home.

"It . . . would be very disruptive to him emotionally, it would disrupt the attachments that he—I would assume are forming with his family right now that he's living with, and I can't see how it would benefit him to wait several years—really, you're asking him to wait in limbo for several years, not being able to fully attach with his family because of the question of leaving that family at some point.

"You can't expect either a child or the people caring for him to form a hundred percent attachment when it's sort of hanging over their heads that this is temporary. So, it . . . will interfere with that attachment between him and the family that he's with if the understanding is that he'll be going back to his mother whenever she is ready to take him."

and continuity and stability of its environment." (Internal quotation marks omitted.) *In re Shyina B.*, 58 Conn. App. 159, 167, 752 A.2d 1139 (2000). "In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]."[17] (Internal quotation marks omitted.) *In re Jermaine S.*, supra, 86 Conn. App. 835. The court thoroughly considered each of the seven criteria before finding that the respondent's failure to address her long-term history of substance abuse and domestic violence issues dictated

---

[17] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

that it would be in R's best interest to terminate her parental rights.

Both the respondent and R argue that they have a loving relationship and a significant bond. They further argue that no evidence was offered that anyone witnessed the respondent's acting inappropriately with R. Nevertheless, "[o]ur courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights. See, e.g., *In re Tyqwane V.*, 85 Conn. App. 528, 536, 857 A.2d 963 (2004); *In re Ashley S.*, 61 Conn. App. 658, 667, 769 A.2d 718, cert. denied, 255 Conn. 950, 769 A.2d 61 (2001); *In re Quanitra M.*, 60 Conn. App. 96, 106, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000)." *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006). Here, there was ample evidence presented regarding the significant bond between R and the respondent. Although the court recognized the evident love that the respondent had for R, it found that the respondent "is not in a position, and [there is] no evidence that she will be in the foreseeable future, to provide for the development, well-being and continuous stability of [R's] environment." The court also credited the testimony of various therapists and psychologists to conclude that "[i]t is not expected that she could achieve an appropriate degree of personal rehabilitation within a reasonable period of time." In light of the foregoing, we conclude that it was not clearly erroneous for the court to have found that it was in the best interest of the child to terminate the parental rights of the respondent.

The judgment is affirmed.

In this opinion the other judges concurred.