# IN RE JOSEPH L. ET AL.*
## (AC 28159)
## (AC 28160)

McLachlan, Gruendel and West, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

516

Argued September 25, 2007—officially released January 29, 2008

*David B. Rozwaski*, for the appellant (respondent mother).

*John E. Hudson*, for the appellant (respondent father).

*Tammy Nguyen-O'Dowd*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Linda K. Herzner*, for the minor children.

*Opinion*

WEST, J. The respondent mother and the respondent father each appeal from the judgments of the trial court rendered in favor of the petitioner, the commissioner of children and families, terminating their parental rights with respect to their minor children, J and M. On appeal, both respondents claim that the court improperly (1) found that they had failed to achieve sufficient personal rehabilitation, (2) found that the termination of parental rights was in the best interests of the children and (3) refused to appoint a guardian ad litem for the minor children. The respondent father also claims that (4) the court improperly refused to certify the children's therapist as an expert. We affirm the judgments of the trial court.

The court found the following facts. The children involved in this proceeding are the respondent mother's ninth and tenth children and the respondent father's fourth and fifth children. None of the respondents' other children have remained in their care. Both respondents have had substantial dealings with the department of children and families (department) prior to this proceeding.

The respondent mother, born May 26, 1964, was herself committed to the custody of the petitioner in 1977 at the age of thirteen. She has had ten children who were fathered by eight different men. Her parental rights were terminated with respect to three of her children, two of them were given to a woman who offered herself as a placement resource, and three of

them are in the custody of their fathers. The respondent mother lost custody of all of her children due to her issues with substance abuse and depression, her predisposition to involvement in abusive relationships with various men and her neglect and abuse of her children.

On September 17, 1999, the respondent mother gave birth to her ninth child, J. In February, 2000, when J was approximately four months old, both respondents were arrested following a domestic violence incident. Both of them were convicted of disorderly conduct for this incident. On May 11, 2002, the respondent mother had M, her tenth child, with the respondent father. In September, 2003, the department received a referral after the respondent mother was arrested for a motor vehicle violation when she was alleged to have been smoking marijuana while her children were in the car with her. She was convicted of possession of marijuana.

In October, 2003, the respondent mother tested positive for illicit substances. The department offered substance abuse evaluations, parent education classes and in-home services to both respondents. The respondents refused in-home services but did attend the parenting class. The respondent father refused the substance abuse evaluation, but the respondent mother participated in a hair test, which was positive for marijuana. She also participated with the Morris Foundation for substance abuse and the McCall Foundation for counseling.

In April, 2004, J's day care center called the department to report that J had bruising on his lower back and buttocks and that J had reported that the respondent mother had hit him with a belt. In June, 2004, the respondent father came home one day to find that the respondent mother had left and had taken the children with her to Florida. He went to Florida to retrieve them. Soon thereafter, the respondent mother called the

department from Florida and made numerous statements regarding the respondent father's treatment of her. She stated that she would do anything to stay away from him and to keep the children safe. She also stated that her history with him included substance abuse, verbal abuse, physical abuse, control and stalking. She also reported that he had opened her mail, did not allow her to have many friends visit and did not permit her to go anywhere. Two days later, the department was contacted by the authorities in Florida, who reported that the police had received reports that the respondent father had threatened the respondent mother and the people she had been living with and that he had slashed the car tires of those people.

In July, 2004, the department received a referral from authorities in Florida regarding J and M. The Florida authorities reported that the respondent mother had returned to Connecticut to attend a court hearing and had left the children in Florida. She was arrested at the court hearing and incarcerated.

The respondent father was born on May 24, 1957. He has five children with four different women, and he does not have custody of the first three children. He was involved in several abusive relationships prior to meeting the respondent mother. His abuse of his female partners contributed to his failure to retain custody of his children. In addition, he has a thirty year criminal record, including convictions for possession of marijuana, harassment, violation of protective orders, disorderly conduct and violation of probation.

The respondent father then had J and M with the respondent mother. Approximately two months after the Florida incident, on August 2, 2004, orders of temporary custody were issued as to both children by the Superior Court. At this point, the children were in the care of the respondent father. The department, along

with the Watertown police, went to his house to execute the orders of temporary custody, but he refused to answer the door. In response, the police entered the home on their own. The department retrieved the two children, and the respondent father was arrested for interference. A social worker testified that J told her in the car on the way to the foster home that his parents beat each other up when they get angry with one another and that he and his brother were hit when they were bad.

The respondents eventually reconciled but not without more drama. In September, 2004, the respondent mother was driving while intoxicated and got into an accident with one of the respondent father's motor vehicles. On that same evening, she threatened to commit suicide and subsequently was taken to a hospital for psychiatric evaluation. Specific steps for reunification were issued by the court, *Brunetti, J.*, on August 2, 2004, and on September 4, 2004, by the court, *C. Taylor, J.* The specific steps required the respondents to do the following: keep all appointments set by or with the department, keep their whereabouts and their children's whereabouts known to the department, participate in individual and family counseling, undergo substance abuse assessment, submit to random drug testing, secure and maintain adequate housing and income, refrain from substance abuse, avoid any further involvement with the criminal justice system, consistently and timely meet and address the children's physical, educational, medical and emotional needs, visit the children as often as permitted and conduct themselves appropriately during visits.[1]

The respondent mother has complied with some of the steps. She has had no more criminal convictions,

---

[1] This list is not exhaustive, but it is fairly representative of the steps required by the court. The full list of specific steps is contained in the court's memorandum of decision.

has maintained housing with the respondent father, has attended an intensive outpatient program that provided parenting classes and urine and hair sample tests for substance abuse and has visited with the children regularly. Nevertheless, she had positive hair tests until November, 2005, refused to participate in a program for domestic violence services because she claimed there was no violence in her relationship with the respondent father, has been unemployed since the issuance of the steps and still depends on the respondent father for financial support.

The respondent father also has complied with some of the steps. He has maintained stable housing, has engaged in parenting classes and substance abuse treatment, has completed a domestic violence program and has engaged in individual and couples counseling. He did not participate in family counseling, however, and has not been employed consistently.

In part, as a result of the respondents' failure to comply fully with the court-ordered specific steps, the petitioner filed petitions on May 17, 2005, pursuant to General Statutes § 17a-112 et seq. to terminate the respondents' parental rights with respect to their children, J and M. The petitioner alleged that the respondents were the parents of children younger than age seven who were neglected or uncared for; they failed, or were unable, to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the ages and needs of the children, they could assume a responsible position in the children's lives; and that their parental rights as to another child previously had been terminated pursuant to a petition brought by the petitioner. A neglect petition also was filed on August 2, 2004. On November 30, 2005, the court, *C. Taylor, J.*, consolidated the neglect and termination of parental rights petitions. Both matters were tried before the court,

*Jongbloed, J.*, on March 6 through 10, May 19 and June 2, 2006. Judge Jongbloed found that the children were neglected, that the parents had failed to achieve rehabilitation and could not do so within a reasonable time period, and that termination of parental rights was in the best interests of the children. These appeals followed.[2] Additional facts will be set forth as necessary.

As a preliminary matter, we set forth the legal principles that guide our resolution of the respondents' claims. "Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. . . . A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Ryan R.*, 102

---

[2] The respondents do not appeal from the granting of the neglect petitions.

Conn. App. 608, 617–18, 926 A.2d 690, cert. denied, 284 Conn. 923, 924, 933 A.2d 724 (2007).

## I

Both respondents argue that the court improperly found that they had failed to achieve sufficient personal rehabilitation pursuant to § 17a-112 (j) (3) (E).[3] We disagree.

The respondent mother argues that there is evidence in the record to indicate that there was reason to believe that she could assume a responsible position in the life of her children within a reasonable time. She argues that she has not used illegal drugs since 2004, has participated in parenting classes and will continue to participate in services offered by the department. Therefore, she argues, the court's finding that she did not have sufficient stability or sobriety to meet the needs of the children was not supported by the record. We disagree.

The court found by clear and convincing evidence that the respondent mother had not achieved a sufficient degree of rehabilitation as would encourage the belief that within a reasonable time, considering the

[3] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child and (3) . . . (E) the parent of a child under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families . . . ."

ages and needs of the children, she could assume a responsible position in the lives of the children. Because the record clearly supported the court's finding, we conclude that the court's finding was not clearly erroneous.

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent . . . [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 628–29, 847 A.2d 883 (2004). The court found that, as of the adjudication date, the respondent mother continued to have a substantial substance abuse problem and continued to be under the respondent father's control. The court further found that she had a long history of abusive, dependent relationships that greatly impaired her parenting ability and that her present abusive, dependent relationship continued the same pattern. Lending itself to this matrix is the fact that she had not obtained any employment and was dependent on the respondent father for all of her economic needs, including, but not limited to, food, shelter and transportation. Moreover, the respondent father had surveillance cameras positioned inside and outside of his house, furthering his complete control over her.

The respondent father argues that the court improperly relied heavily on the opinion of J. Leslie Kurt, a psychiatrist, who testified at trial as an expert in adult and forensic psychiatry. Kurt had stated in a written

evaluation that antisocial personality disorder, with which the respondent father had been diagnosed, was generally regarded as an untreatable disorder. The respondent father argued that it was clear error to rely on the opinion of Kurt because she had not met with or evaluated him since 1996. Furthermore, the respondent father claims that the court improperly failed to perceive the different prognosis of Robert Neems, a psychologist, who testified at trial as an expert in clinical and forensic psychology. The respondent father argues that Neems, who had evaluated him in 2005, also had testified that the symptoms of antisocial personality disorder do diminish. Finally, the respondent father argues that he had sought treatment, had gone to parenting classes and had gone to a drug counseling program. Therefore, he asserts, the court's finding that he had failed to achieve rehabilitation was clearly erroneous. We disagree.

The court found that the respondent father had substance abuse issues after the filing of the petitions for termination of parental rights. In addition, the court found that in the self-assessment, which he completed at the beginning of the domestic violence program in October, 2004, he denied any physical or emotional abuse of a partner in the previous seven years. He also represented that he had not threatened to take the children away, to call the department or to withhold access to the children in that period of time, nor had he damaged any property as a form of intimidation. The court found that he had been completely untruthful. He had threatened to take the children away from the respondent mother, had engaged in acts of violence against her and had damaged property.[4]

---

[4] The court referred to two instances of property damage. The respondent father had slashed the tires of the respondent mother's friends, whose home the respondent mother had taken her children to in Florida. Second, the respondent father had cut the telephone wires of his neighbors when he learned that they had helped the respondent mother get away from his house.

Additionally, the court found that the respondent father failed to provide his therapist, Judith Tsukroff, with relevant information, thereby preventing his therapist from understanding the situation in its entirety and from getting an accurate view of his difficulties. Finally, the court noted that Kurt had diagnosed him with antisocial personality disorder and had written that the disorder was generally regarded as an untreatable disorder. Although the respondent father tried to claim that his compliance with the specific steps and decreased level of criminal activity demonstrated his rehabilitation, the court found that Kurt rendered other explanations for his improvements. She testified that often, individuals with antisocial personality disorder do not have criminal records. Furthermore, the recent absence of physical violence was not surprising in light of the intense scrutiny by the court and the department. Finally, the respondent father's fundamental issue of coercive, controlling and aggressive personality style persists despite any recent lack of physical violence.

The court further found that neither respondent complied fully with all of the requirements set out in the specific steps issued by the court. The respondent mother did not refrain from substance abuse and refused to participate in the domestic violence program. The respondent father did attend required services, but he was not truthful with his providers, thereby diminishing his capacity to benefit from the services. The court also found that the department had been involved with the respondents as early as 2003 and that neither parent had shown any real improvement over that substantial period of time. The court cited the testimony of Neems, who evaluated the respondents between December, 2004, and February, 2005, and who stated that the respondent mother's history of substance abuse, dependency on poorly chosen partners and irresponsibility regarding her children have had a significant impact on

her parenting, and "unless she were to remedy them very dramatically, [these factors] would continue to impact her parenting of children." We conclude that the record amply supports the court's finding that as of the adjudicatory date, the "respondents had not brought themselves into a position in which they could provide adequate care for the children."

The court then considered whether events occurring after the adjudicatory date established "a degree of rehabilitation that is sufficient to foresee that the parents may resume a useful role in the child's life within a reasonable time." (Internal quotation marks omitted.) Quoting *In re Stanley D.*, 61 Conn. App. 224, 230, 763 A.2d 83 (2000). The court noted that both respondents had made some improvements since the adjudicatory date. The respondent mother remained substance free after a positive October, 2005 drug test, and the respondent father had not had any recent arrests. The court found, however, that there were several other factors that led to the conclusion that they had not achieved a sufficient degree of rehabilitation and that such rehabilitation was not foreseeable within a reasonable time. Buttressing this conclusion, the court found that in light of the respondent father's history, his recent behavior, including cutting a neighbor's telephone wire, slashing tires and involving the children in an "interstate tug-of-war," demonstrated that he was not in a position to parent his children. Furthermore, the court found that he was not economically stable, as he continued to work only seasonally and filed a petition in bankruptcy in October, 2005. As for the respondent mother, the court found that she continued to be dependent on the respondent father for all her needs, had not gained employment and remained under his coercive control. Therefore, although the respondents had made some improvements, the court found that they had not

achieved rehabilitation to the degree that would encourage the belief that they would be in such a position to assume a useful role in their children's lives within a reasonable time.

We agree with the court. "[E]ven if a parent has made successful strides in her ability to manage her life and may have achieved a level of stability within her limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, she could assume a responsible position in the life of her children." *In re Alejandro L.*, 91 Conn. App. 248, 260, 881 A.2d 450 (2005). Indeed, as the court pointed out, the issue is not whether the parents have improved their ability to manage their own lives, but whether the parents have gained an ability to care for the specific needs of their children. See *In re Mariah S.*, 61 Conn. App. 248, 261, 763 A.2d 71 (2000) ("[t]he critical issue is whether the parent has gained the ability to care for the particular needs of the child at issue" [internal quotation marks omitted]), cert. denied, 255 Conn. 934, 767 A.2d 104 (2001).

In the present case, each of the children has behavioral issues that require medication and therapy. J was diagnosed with post-traumatic stress disorder traits, physical and emotional abuse and attention deficit hyperactivity disorder. M was diagnosed with adjustment disorder unspecified, attention deficit hyperactivity disorder and post-traumatic stress disorder. He also takes Focalin for his attention deficit hyperactivity disorder. The court found that, despite their efforts, the respondents remain incapable of providing day-to-day care for the children within a reasonable time. Although the respondents have made some improvements in managing their own lives, they have not gained an ability to care for the specific special needs of their children. After reviewing the record, we conclude that the court's

finding that the respondents failed to achieve a sufficient degree of rehabilitation in accordance with § 17a-112 (j) (3) (E) is not clearly erroneous.

## II

Both respondents claim that the court improperly found that termination of their parental rights was in the best interests of the children. We disagree.

"The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]."[5] (Citation omitted; internal quotation

[5] General Statutes § 17a-112 (k) provides in relevant part: "[I]n determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been

marks omitted.) *In re Ryan R.*, supra, 102 Conn. App. 625–26.

The court thoroughly considered each of the seven criteria in its memorandum of decision before concluding that termination of parental rights was in the children's best interests. Both respondents argued that a bond of love existed between them and the children. The respondent mother argued that she had consistent visits with her children and always was caring and nurturing during those visits. The respondent father argued that he had dedicated himself seriously to rehabilitation and that the department never really considered reunification as an option.

The court considered several factors in deciding whether to terminate the parental rights of the respondents, including, among others, the emotional bonds between the children and the respondents, the stability of placement required by the children, the nature of the children's relationships with their foster parents and with the respondents, and the degree of contact maintained with the respondents. The court found that the department offered many services to the respondents, only some of which they took advantage. The court also found that the respondents complied with some of the specific steps issued by the court but not all of them. Their failure to comply with these court-ordered specific steps was detrimental to the children. For example, the respondent father's inability to maintain steady employment precluded his supporting his children financially. In addition, the respondent mother's refusal to participate in a program for domestic violence services put the children at risk for continued living in a coercive, abusive household. Finally, the

prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

court found that the respondents had maintained a regular visiting relationship with the children and that, although they had made some progress recently in terms of remaining substance free and living within the law, they continued to be unable to resume a responsible parental role in their children's lives.

The court focused on the children. The court found that the children needed but lacked permanency, consistency and stability in their lives and noted that their attorney recommended termination of the respondents' parental rights. The court recognized that although the children did have an attachment to their parents and enjoyed their visits with them, that affection, under the circumstances, would not preclude termination. We agree with the court. Although the children may have had a bond with their parents, "[o]ur courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights." (Internal quotation marks omitted.) Id., 627. The court found that "[d]espite the existence of a bond with parents, termination can nevertheless be in a child's best interest." The court found that although both respondents love their children, they are "unable to assume a responsible parental role for the children." For instance, the respondent mother has chosen to continue her relationship with a violent, controlling individual on whom she is completely dependent. Additionally, the court found that the children had already endured difficulties in their lives, "including the trauma of witnessing various domestic violence incidents and living in an environment of coercive control by the respondent father." Finally, the court found that the respondents "remain unable to provide the day-to-day care these children need within a reasonable time." The record amply supports the court's finding that termination was in the best interests of the children. Therefore, we conclude

that it was not clearly erroneous for the court to have found that it was in the best interests of the children to terminate the parental rights of the respondents.

### III

Next, the respondents argue that the court improperly refused to appoint a guardian ad litem for the minor children. We disagree.

The following additional facts are relevant to the disposition of the respondents' claim. On November 30, 2005, prior to trial, the court heard the motions filed by the parties. Counsel for the respondent father made an oral motion, asking the court to appoint a guardian ad litem for the children. The court heard arguments by the parties and denied the request for the appointment of a guardian ad litem. Subsequently, on March 29, 2007, the court articulated on the record the legal reasoning behind its decision. At the motions hearing, the respondent father's attorney argued for the appointment of a guardian ad litem because J was making statements that he wanted to be with his father and wanted to go home. The court asked the respondent mother's attorney if she had an opinion on the matter, and she stated that she would join in the motion of the respondent father's attorney for the reasons he articulated. In response, the attorney representing the petitioner asked the respondent father's attorney to articulate, given the case law, why a guardian ad litem was necessary. The attorney stated that he believed that the attorney representing the children might not be articulating what the children wanted but, instead, was representing what was in the best interests of the children.

The attorney representing the children then spoke, indicating that there was no conflict between the best interests of the children and what they had articulated

because their verbalizations were inconsistent. Furthermore, she stated that both children were at a developmental stage that precluded them from truly understanding the issues and even their desires.

In the articulation of its decision, the court began by citing the relevant statute, General Statutes § 46b-129a (2), which provides in relevant part: "[A] child shall be represented by counsel knowledgeable about representing such children who shall be appointed by the court to represent the child and to act as guardian ad litem for the child. The primary role of any counsel for the child including the counsel who also serves as guardian ad litem, shall be to advocate for the child in accordance with the Rules of Professional Conduct. When a conflict arises between the child's wishes or position and that which counsel for the child believes is in the best interest of the child, the court shall appoint another person as guardian ad litem for the child. The guardian ad litem shall speak on behalf of the best interest of the child and is not required to be an attorney-at-law but shall be knowledgeable about the needs and protection of children. . . ." The court then cited *In re Christina M.*, 280 Conn. 474, 908 A.2d 1073 (2006), for the proposition that "it is necessary to establish a sufficient record for a trial court to inquire as to whether a conflict exists." The court found that the argument made by the respondent father's counsel was not persuasive. The court found that the respondent father had failed to show that both children expressed a wish to return to the family home, that the sentiments allegedly expressed by J were knowingly made and that the child was capable of expressing such a sentiment. Furthermore, the court noted, the respondent father's attorney did not request an evidentiary hearing on the issue. The court also found that the attorney representing the children did not perceive any conflict between her role as an advocate and her role as a guardian ad litem.

Finally, the court found that the children's attorney was "a venerable practitioner in juvenile matters . . . ."

Whether a conflict exists between what is in the child's best interest and what a child wants is essentially a question of fact for the court. In addition to setting forth sufficient evidence to demonstrate a conflict, the respondents must also demonstrate that the alleged improper failure by the court to appoint a guardian ad litem affected the result of the trial. See *In re Brendan C.*, 89 Conn. App. 511, 521, 874 A.2d 826, cert. denied, 274 Conn. 917, 879 A.2d 893, cert. denied, 275 Conn. 910, 882 A.2d 669 (2005).

We agree that the respondent father did not provide enough information to enable the court to conclude that a conflict existed between what the children wanted and what their attorney believed was in their best interests. The respondent father's attorney mentioned only vague statements made by J. He did not request an evidentiary hearing on the issue when the children's attorney opposed the motion for a guardian ad litem. In *In re Christina M.*, the respondents alleged that there was a conflict because one of the minor children had made representations to the court-appointed psychologist that she wanted to go home with her parents and that her parents took care of her and her sisters. *In re Christina M.*, supra, 280 Conn. 493. In contrast, in the present case, the respondent father did not allege that either of his sons had made any representations to a third party of any kind, including a psychologist or some type of evaluator. In the present case, the respondent father argued that J was making statements that he wanted to be with his father and that he wanted to go home. Counsel's argument did not provide a sufficient basis for the court to find a conflict between what was in the best interests of the children and what they wanted.

Even if the respondent father had made an offer of proof to support the finding of a conflict, he did not demonstrate that the court's failure to appoint a guardian ad litem affected the result of the trial. Under the statute, the guardian ad litem must speak on behalf of the best interests of the children, and the court found by clear and convincing evidence that termination of parental rights was in the best interests of the children. In *In re Brendan C.*, the court concluded that "[h]ad a guardian ad litem been appointed, the guardian ad litem's duty would have been to advocate the best interest of the child, which was shown by clear and convincing evidence to be the termination of the respondents' parental rights. The child's counsel would have been free to advocate exclusively for the child's legal interests, which she maintains would be the same position she took during the trial. The respondents fail to explain how the addition of a person advocating for the termination of parental rights would change the result of the trial, which was termination." *In re Brendan C.*, supra, 89 Conn. App. 521. Because the respondents failed to explain how the court's failure to appoint a guardian ad litem would have affected the trial, their claim fails.

IV

Last, the respondent father argues that the court improperly refused to acknowledge the children's therapist as an expert. We disagree.

The following facts are relevant to the disposition of this issue. On March 10, 2006, Samantha Littman, a licensed professional counselor, testified regarding her interactions with the children. Littman was the licensed clinician in the safe home where the children were residing at the time of trial. At the time of trial, she had 3000 hours of supervised experience, including 100 hours of experience under direct supervision. In addition, Littman testified that she obtained her counselor's

license on January 30, 2006, a little less than six weeks prior to her testifying at the trial. The focus of her work was facilitating the children's getting along with one another and with the other children and staff at the safe house. Finally, Littman was never present throughout an entire visit that the children had with the respondents. Nevertheless, she was able to testify regarding the existence of a "bond" between the children and the respondents.

"[T]he trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *State* v. *DiLoreto*, 88 Conn. App. 393, 398, 870 A.2d 1095 (2005). In order to qualify Littman as an expert witness in the area of counseling, the respondent father had to demonstrate "that she had the special skill or knowledge directly applicable to a matter in issue . . . that [her] skill or knowledge is not common to the average person, and [that her] testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) Id.

The court decided not to certify Littman as an expert in the field of counseling. The court based its decision on the fact that Littman was "extremely new to the field." The court held, however, that it could still consider all of her testimony as a witness who had been able to observe the relevant parties in the case. We agree with the court.

In the present case, the witness, Littman, had been licensed for slightly fewer than six weeks prior to testifying at the trial. Although she had had many hours of supervised experience, she was still very new to the field, and therefore the court was hesitant to qualify

her as an expert. The court acted well within its discretion by considering the amount of time she had been certified as a counselor in deciding whether to qualify her as an expert. See *Anderson* v. *Whitten*, 100 Conn. App. 730, 737, 918 A.2d 1056 (2007) (court considered fact that witness had thirty years experience in field in deciding to qualify witness as expert).

Even if the court had abused its discretion by refusing to qualify Littman as an expert, the respondent father's claim would be unsuccessful because he has failed to show the harmfulness of the evidentiary ruling. "Under the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant. The defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *DeJesus*, 260 Conn. 466, 485, 797 A.2d 1101 (2002). The respondent father argued that "[g]iven the importance of Littman's testimony about the parent-child bond and the children's verbalizations about the parent-child relationship, the [c]ourt's refusal to recognize Ms. Littman as an expert went beyond mere harmless error." The court, however, held that it would consider her testimony as it related to her having observed the children and the respondents, even though she was not qualified as an expert witness. Moreover, the court recognized the existence of a bond between the children and the respondents but still held that termination was in the best interests of the children. Therefore, the respondent father failed to prove the harmfulness of the alleged improper evidentiary ruling.

The judgments are affirmed.

In this opinion the other judges concurred.