## IN RE SHEENA I. ET AL.*
### (AC 21021)

Foti, Dranginis and Flynn, Js.

Argued May 2—officially released June 12, 2001

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Matthew T. Gilbride,* for the appellant (respondent mother).

*Jose A. Suarez,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Opinion*

FOTI, J. The respondent mother appeals from the judgments of the trial court terminating her parental rights with respect to her two minor children, S and J. On appeal, the respondent mother claims that the court improperly concluded that (1) she failed to achieve personal rehabilitation within the meaning of General Statutes (Rev. to 1999) § 17a-112 (c) (3) (B) and (2) termination of her parental rights was in her children's best interests. We affirm the judgments of the trial court.

In a comprehensive memorandum of decision dated June 12, 2000, the court recited the following facts and procedural history. On May 7, 1999, the commissioner of children and families (commissioner) filed petitions for the termination of the respondent mother's parental rights with respect to her two children, S and J.[1] The

---

[1] The court's memorandum of decision also addressed the termination of the parental rights of the respondent father, who is the father of J. After the commissioner had filed the termination petitions, paternity testing established that the respondent father was not S's biological father. The respondent mother thereafter named G as S's biological father. Paternity testing

petitions alleged that the children were being denied proper care and attention and that they were being permitted to live in conditions, circumstances or associations that were injurious to their health. The petitions further alleged that J was uncared for and that his home could not provide the specialized care that he required. The petitions also alleged that the respondent had failed to achieve personal rehabilitation after the court had previously adjudicated the children neglected. Additionally, the petitions stated that the children have "been denied, by reason of an act or acts of commission or omission, including but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse by [each of the parents] the care, guidance or control necessary to [their] physical, educational, moral or emotional well-being."

Following a hearing in which the commissioner presented evidence in support of the petitions, the court found the following facts. The respondent's childhood was characterized by family problems. She attempted suicide at age thirteen, underwent psychiatric treatment for several years and reported that she was the victim of multiple rapes. She also has a history of using illegal drugs and engaging in acts of prostitution; this behavior continued through the time of the present proceedings. She gave birth to four children·prior to giving birth to S and J. After those children had been removed from her care and placed with other family members, the respondent's husband instituted divorce proceedings and secured an order of custody for them.

established that G also was not S's biological father. Thereafter, the court ordered publication of notice of the termination proceedings to S's unknown biological father, John Doe. The court ultimately terminated the respondent mother's parental rights with respect to S and J. The court terminated the parental rights of the respondent father of J and the parental rights of John Doe as to S. This appeal concerns only the termination of the respondent mother's parental rights. We refer in this opinion to the respondent mother as the respondent.

There were eleven substantiated referrals of abuse or neglect to the department of children and families (department) concerning the respondent and her family. J was born on July 1, 1995, and at that time he tested positive for the presence of cocaine. In August, 1996, police reported that the respondent used crack cocaine and that her children were hungry and unkempt.

In November, 1996, J suffered burns to over 60 percent of his body resulting from a fire at the respondent's home. J's twin sister, D, died in the fire. J has received extensive medical care for his life threatening injuries. S was three years old and was left unsupervised in a room with J when the fire started. At subsequent counseling sessions, S revealed that she lit the fire because she was upset with her parents. The traumatic experience continues to affect S psychologically.

The commissioner filed neglect petitions after the fire, and the court adjudicated the children neglected in April, 1997. The court ordered protective supervision of the children, and they remained in the respondent's care. Until the supervision period terminated in January, 1998, the department continued to receive reports of abuse and neglect. S's sister, A, told school personnel that the respondent mother had struck A with a belt. S's day care provider reported bruises on her face. In August, 1998, the department of social services reported that the respondent arrived at its office under the influence of illegal drugs.

The commissioner commenced the present proceedings after department social workers visited the respondent's home in October, 1998, and found her children to be very dirty. The children were sleeping on inappropriate mattresses that were badly stained and soaked with urine. Officials at J's school reported that J came to school exhibiting very poor hygienic habits, despite

the fact that the proper care of his fire-related injuries required proper hygiene. Department workers found numerous health code violations in the respondent's home, including a hole in the floor of the stairway, no smoke alarms, electrical hazards, broken windows and the use of a propane grill in the kitchen.

The state ceased providing the family with public assistance benefits, as the respondent had not complied with her obligation to obtain employment. The home had no electricity. The respondent continued living a drug-addicted lifestyle; she left her children in the care of others for days at a time. On November 5, 1998, the commissioner again filed neglect petitions.

In March, 1999, while in court for hearings on the neglect petitions, the respondent was arrested for possession of drug paraphernalia. She admitted using illegal drugs earlier that morning and also admitted to a department worker that by February, 1999, she was injecting as many as eleven bags of heroin daily. The court thereafter granted the commissioner an order of temporary custody for J, S and their half-sister A, and none of the children has been in the care of a biological parent since that time.

The respondent testified at trial that J's father frequently hit her and that she stayed away from the home for several days at a time. She was not aware of the significant problems with the living conditions in her home. She was incarcerated in October, 1999, and was released in May, 2000. She intended to reside with her mother following her release. In April, 1999, a court-appointed psychologist conducted a family evaluation. She stated in her report that during her evaluation the respondent was under the influence of some illegal substance and was unable to remain alert for even a few minutes. The psychologist concluded that the respondent had emotional difficulties and substance

abuse problems, was not the psychological mother of either of the children and should not be allowed even to visit with them until she ceased using illegal drugs.

In September, 1999, Richard Sadler, a psychiatrist, performed a psychiatric evaluation of the respondent. Sadler found her to be "entirely self-absorbed" and essentially unconcerned about her behavior and its effect on her children. He concluded that her children should not be entrusted to her care and that she had provided no indications that she was taking any steps to provide even minimally adequate care for her children.

After the children were removed from the respondent's care, A related accounts of physical and sexual abuse directed at her and her siblings that had occurred in the home. She reported that J's father had hit her with a belt and that the respondent had placed her arms, as well as S's arms, over open flames on the stove as a form of discipline. She also reported that J's father had sexually abused her at bath time and at night.

These accounts were corroborated by S's conversations with her foster mother. She recounted that J's father took baths with her and her half-sister, A. She also told her foster mother that J's father "put things in her behind." S recalled that the respondent and J's father regularly tied her and J to their beds. The respondent acknowledged tying her children to their beds. S told a social worker that she had lit the fire that caused her sister's fatal injuries and severely injured J. She explained that she lit the fire in the bed where J's father had done "bad things" to her, and that she did so because she was mad at J's father and the respondent mother because of the abuse that she was sustaining in the home.

In April, 1999, an official at the Child Guidance Center in Bridgeport interviewed both J and S after their foster parents observed that the children were exhibiting

unusual behaviors. The official testified that S disclosed sexual abuse by J's father and the respondent. The children also were evaluated at the Yale Child Sexual Abuse Clinic beginning in June, 1999. The social worker at the clinic concluded that S had been sexually abused. During her evaluation, S consistently depicted, in both stories and drawings, the various forms of sexual abuse that J's father had inflicted on her. Her brother, J, did not engage interviewers at the clinic, however, the social worker at the clinic noted that the "sexualized behavior" J's foster parent observed in the home added credibility to the allegations of sexual abuse that occurred in the respondent's home.

At the time of trial, S was seven years old, and her foster mother testified that since S had come to live with her, S had made significant progress in both her education and in regard to her self-esteem. J was four years old at the time of trial, and his therapist testified that he had made progress both in terms of allowing others to interact with and care for him, and in terms of controlling his behavior. When they first began living in their foster homes, both children initially engaged in acts of inappropriate touching, anger and hostility, consistent with the abuse that they had suffered. Both the department and the respondent presented various proposals for the children's care to the court during the neglect and termination proceedings.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. *In re Christina V.*, 38 Conn. App. 214, 223, 660 A.2d 863 (1995). The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). *In re Juvenile Appeal*

*(84-3)*, 1 Conn. App. 463, 478, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). *In re Luis C.*, [210 Conn. 157, 166, 554 A.2d 722 (1989)].

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. *In re Michael M.*, [29 Conn. App. 112, 121, 614 A.2d 832 (1992)]; *In re Megan M.*, 24 Conn. App. 338, 342, 588 A.2d 239 (1991); *In re Davon M.*, 16 Conn. App. 693, 696, 548 A.2d 1350 (1988). We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached; *Pandolphe's Auto Parts, Inc.* v. *Manchester*, [supra, 181 Conn. 222]; nor do we retry the case or pass upon the credibility of the witnesses. *In re Christine F.*, 6 Conn. App. 360, 366–67, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986). Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. *State* v. *Jones*, 205 Conn. 638, 660, 534 A.2d 1199 (1987). *In re Kezia M.*, 33 Conn. App. 12, [17], 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993); *In re Felicia D.*, 35 Conn. App. 490, 499, 646 A.2d 862, cert. denied, 231 Conn. 931, 649 A.2d 253 (1994). . . . *In re Eden F.*, 48 Conn. App. 290, 309, 710 A.2d 771 [(1998), rev'd on other grounds, 250 Conn. 674, 741 A.2d 873 (1999)]." (Internal quotation marks omitted.) *In re Sheila J.*, 62 Conn. App. 470, 476–77, 771 A.2d 244 (2001).

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. *In re Tabitha P.*, 39 Conn. App. 353, 360, 664 A.2d 1168 (1995). In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under General Statutes (Rev. to 1999) § 17a-112 (c)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial

court determines whether termination is in the best interests of the child. . . . *In re Danuael D.*, 51 Conn. App. 829, 835–37, 724 A.2d 546 (1999); *In re Roshawn R.*, 51 Conn. App. 44, 51–52, 720 A.2d 1112 (1998). . . .

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interests of the child. In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes (Rev. to 1997) § 17a-112 (e) . . . . *In re Denzel A.*, 53 Conn. App. 827, 831–33, 733 A.2d 298 (1999)." (Citations omitted; internal quotation marks omitted.) *In re Deana E.*, 61 Conn. App. 185, 189–90, 763 A.2d 37 (2000). At the time of the filing of the petitions in the present case, the applicable statutory provisions appeared at General Statutes (Rev. to 1999) § 17a-112 (c) and (d).

I

The respondent first claims that we should reverse the court's judgment because it improperly considered her conduct subsequent to the adjudicatory date in this case. We disagree.

In the adjudicatory phase of a termination proceeding, the court is limited to considering events that precede the date of the filing of the petition or the latest amendment to the petition, also known as the adjudicatory date. Practice Book § 33-3 (a). The court may consider, however, events occurring after the adjudicatory date during the dispositional phase of a termination proceeding. Practice Book § 33-5.

In the present case, the adjudicatory date was May 7, 1999. The respondent argues that the court's finding that she failed to achieve personal rehabilitation was

clearly erroneous because the court noted that it considered her behavior occurring after the adjudicatory date. The respondent further asserts that the consideration of this evidence "tainted the adjudicatory phase of this proceeding."

The petitions to terminate the respondent's parental rights rested on two distinct statutory grounds. First, the petitions alleged, pursuant to General Statutes (Rev. to 1999) § 17a-112 (c) (3) (B),[2] that the respondent had failed to achieve personal rehabilitation. The court found, by clear and convincing evidence, that the respondent had not achieved a sufficient degree of rehabilitation, if any, as of the adjudicatory date. The court found persuasive the opinion of the court-appointed psychiatrist who had examined the respondent. He unequivocally stated that "no amount of services would ever be able to restore [the respondent] to a useful parental role." The court further found, by clear and convincing evidence, that the respondent's conduct both prior to and following the adjudicative date demonstrated that "she cannot be rehabilitated as a parent of these children within the reasonably foreseeable future, consistent with their needs for permanency."

Second, the petitions alleged acts of parental commission or omission by the respondent pursuant to General Statutes (Rev. to 1999) § 17a-112 (c) (3) (C).[3] In regard

[2] General Statutes (Rev. to 1999) § 17a-112 (c) (3) (B) provides that the court may grant a petition to terminate parental rights if it finds by clear and convincing evidence that "the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding, or (2) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and such parent has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[3] General Statutes (Rev. to 1999) § 17a-112 (c) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that . . . (C) the child

to this ground for termination of parental rights, the court found, by clear and convincing evidence, that the respondent had burned S's arms and that she had engaged in acts of parental commission and omission in terms of her lengthy absences from home, her knowledge of the neglect and abuse inflicted on her children by J's father and her failure to take steps to protect her children from such abuse. The court further found, by clear and convincing evidence, that those acts seriously injured the children.

Because the court needed to find that only one statutory ground for termination existed in the adjudicative phase of the proceeding before moving to the dispositional phase of the proceeding, we find no merit to the respondent's claim. We need not address the respondent's argument that the court improperly considered her conduct after the adjudicatory date in its analysis concerning rehabilitation for purposes of § 17a-112 (c) (3) (B).[4] Even if that ground of the court's decision were improper, the respondent mother does not challenge the propriety of the court's conclusion that her parental rights should be terminated pursuant to § 17a-112 (c) (3) (C).[5]

has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Non-accidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ."

[4] We note, however, that while the court did refer to conduct occurring after the adjudicatory date, the court found by clear and convincing evidence that the respondent had failed to achieve personal rehabilitation as of the adjudicatory date.

[5] The respondent also argues that the court somehow "tainted" the entire adjudicatory phase of the termination proceeding by improperly considering her conduct after the adjudicatory date. We find this argument to be without merit. The respondent offers no authority, and we are not aware of any, to support her argument that any error in this regard tainted that phase of the trial. The court made explicit findings concerning her conduct that occurred prior to the adjudicatory date and that violated General Statutes § 17a-112

"We need uphold only one statutory ground found by the court to affirm its decision to terminate parental rights. *In re John G.*, 56 Conn. App. 12, 20 n.4, 740 A.2d 496 (1999). To prevail on her claim that the court improperly terminated her parental rights, the respondent must successfully challenge all of the bases of the judgment terminating her parental rights. If [any] of the grounds on which the trial court relied are upheld on appeal, the termination of parental rights must stand. . . . Id. Because one statutory ground for termination properly exists . . . we need not reach the respondent's claim . . . ." (Internal quotation marks omitted.) *In re Mariah S.*, 61 Conn. App. 248, 267–68, 763 A.2d 71 (2000), cert. denied, 255 Conn. 934, 767 A.2d 104 (2001).

II

The respondent next claims that the court's decision in the dispositional phase of the termination proceeding that termination of her parental rights was in the best interests of her children was clearly erroneous. We disagree.

The respondent argues that the court improperly terminated her parental rights by appointing the commissioner as the children's statutory parent. She argues that the court should have placed the children in long-term foster care or transferred their guardianship either to the children's maternal grandmother or to their maternal aunt. She argues that this court previously has recognized the importance of maintaining contact between a child and his or her biological parent and that the court could have achieved a sense of perma-

(c) (3) (C). It is well established that parties seeking relief before our state appellate courts must not merely assert claims without adequately briefing them. "Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Szczerkowski* v. *Karmelowicz*, 60 Conn. App. 429, 436, 759 A.2d 1050 (2000).

nency for her children without severing her parental rights.

As we explained earlier, a court may proceed to the dispositional phase of a termination proceeding only after finding by clear and convincing evidence that one or more of the statutory grounds for termination exists. *In re Deana E.*, supra, 61 Conn. App. 189. In the dispositional phase, the court determines whether termination is in the best interests of the children. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes (Rev. to 1999) § 17a-112 (d). *In re Kasheema L.*, 56 Conn. App. 484, 490, 744 A.2d 441, cert. denied, 252 Conn. 945, 747 A.2d 522 (2000); *In re Tabitha P.*, supra, 39 Conn. App. 362.

In the present case, the court made the required statutory findings delineated in § 17a-112 (d). It found, by clear and convincing evidence, that both S and J required permanency and stability in their lives. Relying on the ample testimony and evidence presented to the court by expert witnesses, the court determined that the respondent had failed to make any changes in her life "to accommodate the care and nurturing of these children." The court further found that "permanent placement or adoption by a family that understands and can accommodate their needs is the avenue most likely to accomplish permanency for them."

Reviewing the court's findings and conclusions under the clearly erroneous standard; *In re Tricia A.*, 55 Conn. App. 111, 116, 737 A.2d 974 (1999); we cannot disturb its decision to terminate parental rights where "the totality of the evidence, including reasonable inferences [drawn] therefrom, supports the [court's] verdict . . . ." (Internal quotation marks omitted.) *In re Quanitra M.*, 60 Conn. App. 96, 106, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000).

Ample evidence in the record supports the court's conclusion that termination was in the children's best interests. The respondent asks us, essentially, to substitute our judgment for that of the court. We will not do so. While there are cases where a court may deem it appropriate for a child to maintain contact with his or her biological parent, the court did not so find in this case. In the dispositional phase of a termination proceeding, the court properly considers only whether the parent's parental rights should be terminated, not where or with whom a child should reside following termination. See *In re Denzel A.*, supra, 53 Conn. App. 834–35. The record overwhelmingly supports the fact that both S and J need to be "raised in a safe, predictable, caring and nurturing home." Ample evidence supports the court's findings that the respondent did not provide her children with this type of home in the past and is incapable of providing them with this type of home in the future. The court specifically found that a transfer of guardianship either to the children's maternal grandmother or to their aunt would not suit the children's best interests, and we conclude that the record supports this conclusion.

The judgments are affirmed.

In this opinion the other judges concurred.