## PENNY CHERNICK v. JOSEPHINE JOHNSTON
## (AC 27077)

Flynn, C. J., and Gruendel and Rogers, Js.

Argued December 11, 2006—officially released April 3, 2007

*William F. Gallagher*, with whom, on the brief, was *Hugh D. Hughes*, for the appellant (defendant).

*Laura A. Klein*, for the appellee (plaintiff).

*Opinion*

GRUENDEL, J. This appeal concerns the misappropriation of funds purportedly withheld for the well-being of a family member. The defendant, Josephine Johnston, appeals from the judgment of the trial court finding her liable for statutory theft pursuant to General Statutes § 52-564,[1] conversion and breach of fiduciary duty. On appeal, she claims that the court improperly concluded that the plaintiff, Penny Chernick, had proven statutory theft by clear and convincing evidence.[2] We affirm the judgment of the trial court.

The following facts and procedural history are necessary for our disposition of the defendant's appeal. In December, 1995, the plaintiff, who had been residing

---

[1] General Statutes § 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

[2] "Statutory theft under [General Statutes] § 52-564 is synonymous with larceny under General Statutes § 53a-119. . . . Pursuant to § 53a-119, [a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or [withholds] such property from an owner." (Internal quotation marks omitted.) *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 771, 905 A.2d 623 (2006).

The defendant's other claim, relating to the court's miscalculation of damages on the basis of the plaintiff's gross income rather than her net income during the time in question, was withdrawn following our order for supplemental briefing. In response to the plaintiff's ten page brief documenting the evidentiary basis for her summary of gross and net income, the defendant conceded that "[t]he plaintiff's supplemental brief has proven to the satisfaction of the defendant that the trial court used net rather than gross income. The only mistake is a de minimis one."

in Georgia with her mother, came to Connecticut to visit her father. She then met the defendant, her paternal aunt, for the first time, and, presumably because the plaintiff had been having problems with her mother, she lived with the defendant for two years. During the two year period, the plaintiff worked at Wal-Mart and Dunkin' Donuts, and all of her paychecks were given to or received by the defendant.

In August, 1997, in anticipation of the plaintiff's imminent move into her own apartment, the defendant drove her to a Fleet Bank (bank) office in Torrington and had her sign a document granting the defendant durable power of attorney.[3] The defendant agreed to pay all of her niece's bills from her money and save the rest for her "future."[4] From the signing of the durable power of attorney in August, 1997, until December 3, 2001, the plaintiff's paychecks either were cashed or placed into a bank account entitled "Josephine Johnston ITF (In Trust For) Penny Chernick."[5] Often, the plaintiff's uncle, who is also the defendant's brother, Joseph Romanelli, would pick up her paychecks from Wal-Mart and Dunkin' Donuts. In October, 2000, the defendant opened a

---

[3] In its memorandum of decision, the court stated that the plaintiff, "hardly a sophisticated financial person, was told by [the defendant] that this move was necessary to protect any future earnings from her natural mother in Georgia, who might try to take her money from her somehow. There was no evidence presented as to why such an event might occur, no less any legal basis why the mother of a thirty-three year old woman would have any right or claim to her daughter's earnings or savings."

[4] During this time period the defendant paid for the plaintiff's rent, electricity bills, telephone bills and medical bills, as well as for her groceries and incidental expenses. The court concluded that the plaintiff "was in economic bondage to her aunt . . . ."

[5] The account was opened with $6127.56, which the court found "unquestionably represented [the plaintiff's] funds that were saved from her paychecks for her 'future' from her work at Dunkin' Donuts and Wal-Mart during the preceding two years. [The defendant] testified on the [witness] stand that this money was *hers* and not [the plaintiff's]. One has to open a questioning eye to testimony that a person opens an account for another, not with $4000, $5000, $6000, but with exactly $6127.56!" (Emphasis in original.)

new and separate trust account at the bank, into which the plaintiff's Wal-Mart paychecks were deposited directly. The plaintiff eventually retained an attorney, and on December 3, 2001, she sent letters to both the bank and the defendant, demanding that the durable power of attorney and the direct deposit of her Wal-Mart checks be terminated. Thereafter, the plaintiff collected her own paychecks. Despite subsequent requests by the plaintiff's attorney, the defendant did not liquidate the funds left in the trust accounts and remit them to the plaintiff with a full accounting.

On July 31, 2002, the plaintiff filed a six count complaint sounding in conversion, breach of fiduciary duty and statutory theft. The matter was tried to the court on December 2, 3 and 10, 2003, and the court issued its memorandum of decision on January 28, 2005, rendering judgment in favor of the plaintiff on all three theories of recovery.[6] An initial appeal by the defendant, filed on March 7, 2005, was dismissed for lack of a final judgment, and on October 18, 2005, the court issued its decision regarding the amount of interest owed. This appeal followed.

The defendant claims that the court improperly found that she had received all of the plaintiff's paychecks during the more than four years that she maintained durable power of attorney. Specifically, she claims that, because the plaintiff failed to prove by clear and convincing evidence that the defendant had received the money from cashed paychecks that she had not signed, the court's finding of statutory theft pursuant to § 52-564 was clearly erroneous. We disagree.

---

[6] On March 11, 2005, the defendant filed a motion to vacate the judgment due to untimeliness, pursuant to General Statutes § 51-183b. The plaintiff filed an objection to the motion on April 4, 2005, which stated that the defendant had, by written correspondence, waived the 120 day time limit in which to issue a decision, as set forth in § 51-183b. On June 24, 2005, the court denied the defendant's motion to vacate the judgment.

Before setting out the appropriate standard of review, we note that the plaintiff's burden to prove statutory theft pursuant to § 52-564 was by clear and convincing evidence. See *Suarez-Negrete* v. *Trotta*, 47 Conn. App. 517, 520, 705 A.2d 215 (1998) ("[t]he trial court properly recognized that the plaintiff was required to satisfy the higher standard of proof by clear and convincing evidence to be entitled to an award of treble damages pursuant to § 52-564"). "Clear and convincing proof is a demanding standard denot[ing] a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Notopoulos* v. *Statewide Grievance Committee*, 277 Conn. 218, 226, 890 A.2d 509, cert. denied, 549 U.S. 823, 127 S. Ct. 157, 166 L. Ed. 2d 39 (2006). "The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Nelmarie O.*, 97 Conn. App. 624, 627, 905 A.2d 706 (2006).

The court acknowledged that "[t]here is some conflict as to who signed [the plaintiff's] paychecks for cash or deposit." The well reasoned memorandum of decision reflects that the court conducted a thorough review of the exhibits, including the many copies of signed paychecks during the time in question. It affirmed that the comparisons of handwriting were "astounding in their similarity." "Authorship of handwriting can . . . be proved by a comparison of the disputed writing with a specimen of known authorship. . . . Comparisons may be made by the trier of fact, be it judge or jury, with or without the aid of expert testimony." (Citations omitted.) C. Tait, Connecticut Evidence (3d Ed. 2001) § 9.6.3, p. 762.

It is clear that the court believed that "the entire case turned on the question of credibility." It found that the plaintiff was credible in her testimony and demeanor and that the defendant was not.[7] The court found particularly enlightening the unbiased testimony of Donna

---

[7] The court documented a list of fifteen instances of funds that the defendant claims to have expended on the plaintiff's behalf that emphasized the defendant's "chicanery and lack of credibility:

"(1) A check in the amount of $189.33 ostensibly for Thanksgiving foods. [The plaintiff] acknowledges she was invited to [the defendant's] for Thanksgiving in 2000 but was never told she was the financial hostess.

"(2) A check in the amount of $97.53 in 1998 to her father for groceries he never bought her. . . .

"(6) A check in the amount of $41.92 in 2000 for 'Pies, cookies for [the plaintiff].' [The plaintiff] testified credibly that she never received any pies from [the defendant]. . . .

"(8) Certain checks made out to Fuller Brush for items that [the plaintiff] was alleged to have received. [The plaintiff] denies receiving these items. It should be noted that [the defendant] was the Fuller Brush representative and was unable to provide any documentation that [the plaintiff] received any of these objects at trial!

"In total, there were seven checks made out to Fuller Brush totaling $531.35 that [the plaintiff] disputes and [the defendant] cannot document or explain. . . .

"(11) A check for $88.55 in 1999 to Toys 'R' Us. [The plaintiff] testified that she, as a thirty-three year old woman, never received any such toys. . . .

"(15) There were eleven checks to Wal-Mart from 1998 through 2000 in the total amount of $1149.87. These items . . . include a gift certificate,

Filous, personnel manager at Wal-Mart, who stated: "When [the plaintiff] started dating, I know there was an issue where [the plaintiff] had direct deposit and she had canceled the direct deposit and wished to pick up her own check, and [the defendant] called me and told me that she was—she had power of attorney and that [the plaintiff] was not allowed to pick up her check, that either she or [Romanelli] would pick up the check because they do—did have some concerns because she was dating." Filous further testified that, despite the plaintiff's efforts to pick up her own paychecks, the personnel department honored the power of attorney in the plaintiff's personnel file and would not allow her to take them.

The court further found that the defendant was not credible in her explanations of the signatures: "This court finds as fact based upon not merely its viewing of the many documents, but by the demeanor of the witnesses and its assessment of their credibility as well, that [the defendant] was the usual and regular signatory." "We are not in a position to question the court's credibility finding. The sifting and weighing of evidence is peculiarly the function of the trier. [N]othing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony. . . . The trier is free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *Rollar Construction & Demolition, Inc.* v. *Granite Rock Associates, LLC*, 94 Conn. App. 125, 132, 891 A.2d 133 (2006). Accordingly, the court's conclusion that the

---

videotapes, [sneakers] and shoes, [underwear], snacks and batteries. [The plaintiff] adamantly and credibly denies receiving any of these items. One check, for example, in the amount of $189.62 indicates it was 'Penny gift to Henry.' [The plaintiff] denies that she ever bought Henry a gift for him in that amount. Rather, [the plaintiff] says she bought Henry some pants from her tip money at Dunkin' Donuts. Henry was her then boyfriend and now husband."

plaintiff proved by clear and convincing evidence that the defendant "indisputably received *all* of [the plaintiff's] paychecks from her employment"; (emphasis added); and illegally detained and used the income therefrom was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.