IN RE ANTHONY H. ET AL.*
(AC 28275)

DiPentima, Lavine and Dupont, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 21—officially released December 11, 2007

*Roseann C. Canny*, for the appellant (respondent mother).

*Jessica C. Torres*, assistant attorney general, with whom were *Michael J. Besso*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney

general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Opinion*

LAVINE, J. The respondent mother appeals from the judgments of the trial court terminating her parental rights with respect to her minor children, Anthony and Ariana.[1] On appeal, the respondent claims that the court improperly concluded that (1) the petitioner, the commissioner of children and families, proved by clear and convincing evidence that she had failed to achieve such degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives and (2) it was in the best interests of the children to terminate her parental rights. We affirm the judgments of the trial court.

Our decision is informed by the following facts found by the court, *C. Taylor, J.* The respondent was first involved with the department of children and families (department) in 1985 when she herself was about six years old. The respondent's father was unavailable to her due to his job as an over-the-road truck driver, and her mother was abusing marijuana when the respondent was six years old. The respondent was one of five children removed from the family home and placed with their paternal grandmother. The respondent's mother moved to Florida, where the respondent spent time with her. The man with whom the respondent's mother was living was abusive toward the respondent's mother, the respondent and animals.

The respondent met R when he was living platonically with the respondent's sister. One month after the

---

[1] The children's fathers consented to the termination of their parental rights. In this opinion, we refer to the children's mother as the respondent.

Counsel for the children filed a statement adopting the brief of the petitioner, the commissioner of children and families.

respondent started a relationship with R, he was arrested for possession of marijuana. The respondent claimed that her mother made her end her relationship with R. She also claimed that she was institutionalized for suicidal ideation, but she denies any past or present self-destructive thoughts. When the respondent was released from the institution, she returned to Connecticut and R. R impregnated the respondent when she was sixteen. She dropped out of high school. Although their relationship had at first been satisfactory, the respondent discovered that R was using cocaine, and she left him when she was three months pregnant. She returned, however, when she was six months pregnant and remained with R until Anthony was eighteen months old. The respondent left R due to his infidelity, their arguments and problematic behavior.

After the respondent was separated from R, she met J, with whom she began a five month relationship. While the respondent was with J, R took Anthony and refused to return him. The respondent regained custody of Anthony by means of a court order. The respondent nonetheless returned to R on Christmas Eve, 2000, when she was five months pregnant with Ariana. The respondent informed the department that R threatened to evict her unless she gave Ariana his last name, although he was not the child's biological father. The respondent continued to see J surreptitiously after Ariana's birth so that J could see his daughter. The respondent's relationship with J ended when he was incarcerated, at which time Ariana was two and one-half years old.

On June 18, 2002, the department anonymously received information about Anthony and Ariana, indicating that the respondent and the children were homeless, transient and in the company of R. R was using illegal substances, abusing the respondent and taking

her money to support his substance abuse. The department investigated and opened an active file. On September 15, 2002, the department received another anonymous referral concerning the children, alleging that they were physically neglected. The department determined that the respondent was in communication with R, despite a protective order of no contact against him. Although R was abusing crack cocaine, the respondent permitted him to care for the children. The respondent had asked certain individuals not to tell the department that she had been in R's company. At that time, the petitioner executed a ninety-six hour hold on the children. See General Statutes § 17a-101g.

On September 16, 2002, the petitioner filed a neglect petition on behalf of the children because they were living in conditions injurious to them, and the court, *Mack, J.*, granted an order of temporary custody and issued specific steps for the respondent to follow. Judge Mack also found that the department had made reasonable efforts to prevent or eliminate the need to remove the children from the respondent's home. The order of temporary custody was withdrawn by the petitioner on September 23, 2002, because the respondent and the children entered a domestic violence shelter. The respondent entered a plea of nolo contendere to the allegation of neglect. Judge Mack accepted the respondent's plea and ordered that the children be placed under protective supervision for six months. Judge Mack twice extended the protective supervision.

On August 8, 2003, the petitioner again executed a ninety-six hour hold on the children. The department had received another anonymous tip about the respondent and the children. The department investigated and learned that the respondent and the children were living with a convicted sex offender because they were homeless. Although the respondent initially concealed the

children's whereabouts from the department, the petitioner eventually took them into her care. Judge Mack opened the judgment of temporary custody and committed the children to the custody of the petitioner until further order.

In the fall of 2004, Judge Mack issued specific steps for the respondent to follow, found that the department had made reasonable steps to prevent or eliminate the need to remove the children from the respondent's home and approved a permanency plan that called for the termination of the respondent's parental rights and adoption of the children. The petitioner filed petitions for the termination of the respondent's parental rights on December 29, 2004, on the basis of the respondent's failure to achieve rehabilitation. In August, 2005, the court, *Bear, J.*, granted the petitioner's motion to maintain commitment and the permanency plan.

Trial on the petitions to terminate the respondent's parental rights began on May 2, 2006, before Judge Taylor, and continued on May 4, and June 13, 2006. On September 28, 2006, the court found by clear and convincing evidence that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, she could assume a responsible position in the lives of her children. See General Statutes § 17a-112 (j) (3) (B) (ii).

The court found by clear and convincing evidence that the respondent had been referred to a parent aid program but that she was uncooperative and failed to complete a parenting class at United Services. The respondent has a history of unstable housing. Although she entered a shelter as a result of the order of temporary custody in 2002, she was dismissed from the shelter in October, 2002, because she failed to supervise Ariana

properly and compromised the shelter's safety by having continued contact with R. She also had lived with her father and her sister in a one bedroom apartment, among other arrangements. The department of social services helped the respondent obtain a voucher from the United States Department of Housing and Urban Development, but the voucher expired due to the respondent's poor credit rating and her inability to provide a security deposit. Although the respondent was referred to the Thames River Family Program (Thames River) in September, 2003, she did not enter the program until February 8, 2006, due to her failure to keep a job or to perfect the application. At the time of trial, the respondent was living at Thames River with a third child, born subsequent to the filing of the petitions for the termination of her parental rights as to Anthony and Ariana. The father of the respondent's third child is D, who is not a father figure to the child.

The court found by clear and convincing evidence that the department made reasonable efforts to locate the respondent and to maintain contact with her as required by § 17a-112 (j) (1). The court also found by clear and convincing evidence that the department provided services[2] to the respondent but that she failed to comply with most of the services to which she was referred or failed to complete the services in a timely manner. In addition, the court found by clear and convincing evidence that the department made reasonable efforts to reunite the respondent with her children. The respondent was aware of her problems and deficits and

[2] The respondent was offered the following services by a number of private and public agencies: probation supervision, parenting education, case management services, housing assistance, supervised visitation, transportation assistance, paternity testing, referral to domestic violence shelters, financial assistance, subsidized housing, family and individual therapy, psychological and interactional evaluations, substance abuse evaluation, domestic violence group therapy and educational placement and visitation resources for the children.

received specific steps she needed to take to address those issues. Despite notification, the respondent remained unable to benefit from reasonable reunification services. The court found that further efforts at reunification were not appropriate for the respondent and the children.

The court ultimately found that the petitioner had proven by clear and convincing evidence that the respondent had failed to achieve rehabilitation sufficient to render her able to care for the children. General Statutes § 17a-112 (j) (3) (B). The clear and convincing evidence demonstrated that the respondent's problems are those of criminal recidivism, mental health, substance abuse, domestic violence, parenting deficits, transience, residential instability and failure to complete and benefit from counseling. The court concluded that the respondent had not corrected the factors that led to the children's initial commitment. The respondent completed virtually none of the various referrals and counseling in a timely manner, and she failed, until the time of trial, to show any consistent benefit from the programs to which she was referred.

As to Anthony, the court made the following findings of fact. He was born in 1999, the sole issue of the respondent and R. He was removed from the respondent's custody pursuant to a ninety-six hour hold on September 15, 2002, and again on August 8, 2003. He was removed from the respondent's custody for the last time and committed to the custody of the petitioner on September 10, 2004. Anthony has been diagnosed with attention deficient hyperactivity disorder and adjustment disorder. He sees a psychiatrist who manages his medication, and he had been in individual therapy for more than one year at the time of trial. At a time proximate to trial, Anthony was diagnosed with special movements (tics).

Ruth Pearlman, who holds a master of social work degree, had been Anthony's individual therapist until shortly before trial.[3] On the basis of Pearlman's testimony at trial, the court found that in therapy, Anthony would make progress and then regress. He requires a substantial amount of structure, which his prior therapeutic foster homes were able to provide. Anthony is obsessive about certain things, aggressive and socially delayed. His behavior is due to his frustration. He is not verbal and has difficulty expressing his feelings. At the time of trial, Anthony's perseverant behavior was more pronounced. Pearlman's therapy goals for Anthony were to decrease his tantrums and his oppositional behavior and to interrupt his intrusive thoughts.

According to Pearlman, Anthony needs to be in a home where the expectations are clear and known to him. He has subtle symptoms of sexual abuse and needs to be in the care of a treatment parent. During his time in a prior therapeutic foster home, Anthony campaigned to undermine the placement. Anthony wants a placement without rules and perceives the respondent as a parent with few rules. In Pearlman's opinion, Anthony will continue to undermine future placements because he believes that, if he does, he will be returned to the respondent's care. The court concluded that there was clear and convincing evidence that Anthony has substantial behavioral issues.

Chris Lacey, assistant program director at the Waterford Country School Safe House (safe house), testified at trial. When Anthony was twice placed in the safe house in 2003, he manifested substantial behavioral issues. He behaved as a two year old rather than a four year old. He had tantrums if he did not get his way and engaged in theft. The safe house personnel were unable

---

[3] Sue-Ellen Daniel of Counseling Connections then became Anthony's therapist.

to effect change in Anthony's behaviors and recommended that he be placed in a therapeutic foster home. In October, 2003, the department placed him in a therapeutic foster home through the Institute of Professional Practice (institute). The institute employed a therapist and a behaviorist to work with Anthony and his foster family.

Anthony's unacceptable behavior, however, increased in 2006. He became upset when he learned that Ariana had been placed in a preadoptive home. Anthony told the respondent that his foster parents were abusing him physically. The department and the institute investigated Anthony's allegations of abuse and found them to be baseless. The court found by clear and convincing evidence that Anthony believes that if he undermines his foster placement, he will be returned to the respondent. In February, 2006, the foster parents requested that Anthony be removed from their home due to his allegations. The clear and convincing evidence indicated that Anthony's behavior deteriorated when he learned that he would be leaving the foster home.

Anthony is considered to be extremely bright. He attended Head Start and completed the first grade. His reading level is above average. Although Anthony displays social and emotional delays and has difficulty making transitions at school and throws tantrums, he does not qualify for or require special education services. He utilizes the services of the school psychiatrist. His foster parents enrolled him in a youth soccer program but had to withdraw him because he failed to follow the coach's directions.

The court found by clear and convincing evidence that Anthony is bonded to the respondent and Ariana. He also has a connection to the respondent's third child.

Ariana was born to the respondent in 2001. She, too, was removed from the respondent's custody pursuant to a ninety-six hour hold on September 15, 2002, and again on August 8, 2003. She was finally removed pursuant to an order of temporary custody on August 12, 2003, and committed to the custody of the petitioner on September 10, 2004. Her father is J.

The court found that at the time of trial, Ariana was in a preadoptive foster home and that she had been in her previous foster home for about two years. While she was in the first foster home, Ariana attended a play group. She receives speech therapy through the local school system. Ariana was to begin kindergarten in the fall following trial. In the past, Ariana has mimicked Anthony's aggressive behavior. Her current foster mother reported to the department that Ariana is a happy child most of the time. Sometimes she is, however, independent and challenging to the expectations of the home. Ariana gets along with her peers in day care and engages in positive relationships. She participates in dance class and the church choir. The court found by clear and convincing evidence that Ariana is bonded to the respondent and Anthony and has a connection with the respondent's third child.

After the court found by clear and convincing evidence that a statutory ground to terminate the respondent's parental rights with respect to the children existed, it determined that termination was in the best interests of Anthony and Ariana. The court made the seven factual findings required by § 17a-112 (k). See part II. The court's ultimate findings, in summary, were that the respondent's numerous issues remain antithetical to safe, responsible and nurturing parenting and that she is antagonistic to the best interests of her children. Given their needs, the children cannot wait any longer for the respondent to achieve rehabilitation. The court, therefore, ordered the parental rights of the respondent with respect to Anthony and Ariana termi-

nated. The respondent timely filed an appeal from the judgments.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Brittany J.*, 100 Conn. App. 329, 334, 917 A.2d 1024 (2007).

"A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority, when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence. . . . The question for this court . . . is not whether it would have made the findings the trial court did, but whether in view of the evidence and pleadings in the whole record it is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *In re Ebony H.*, 68 Conn. App. 342, 348–49 n.4, 789 A.2d 1158 (2002).

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) *In re Sheena I.*, 63 Conn. App. 713, 720–21, 778 A.2d 997 (2001).

I

The respondent's first claim is that the court improperly found that the petitioner had proved by clear and convincing evidence that she had failed to achieve the degree of rehabilitation required to avoid a termination of parental rights. We disagree.

"The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous." (Internal quotation marks omitted.) Id., 719. "Clear and convincing proof is a demanding standard denot[ing] a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Chernick v. Johnston*, 100 Conn. App. 276, 280, 917 A.2d 1042, cert. denied, 282 Conn. 919, 925 A.2d 1101 (2007).

General Statutes § 17a-112 (j) provides in relevant part that "the Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (B) the child . . . has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and [the parent] has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999).

"In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights." Practice Book § 35a-7 (a). "In the adjudicatory phase, the court *may* rely

on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original; internal quotation marks omitted.) *In re Jennifer W.*, 75 Conn. App. 485, 495, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003).

The court found by clear and convincing evidence that the respondent is unable or unwilling to make realistic and sustained efforts to conform her individual conduct to acceptable parental standards. The department made numerous referrals for the respondent during the pendency of this case. The respondent failed to take advantage of the referrals in a timely manner, and it was not until the filing of the termination petitions that she demonstrated any willingness to address her problems. The respondent has not made the changes necessary in her lifestyle in a timely manner that would indicate that she would be a safe, responsible and nurturing parent for the children.

The respondent's principal argument in support of her appellate claim is that she was in a much better position to care for the children at the time of trial than she was when they were removed from her care in August, 2003.[4] That is not the standard, however, by which the court was to make its determination as to whether the respondent had achieved rehabilitation. The standard is whether the respondent had achieved such degree of personal rehabilitation as would encourage the belief that within a reasonable time she would

[4] In this section of her brief, the respondent also presents numerous arguments concerning the children's behavioral and psychological issues and how they are bonded to her. Those issues are not relevant considerations during the adjudication phase of a termination of parental rights proceeding, except as to whether the respondent sufficiently rehabilitated to address the needs of a child. See General Statutes § 17a-112 (j) (3) (B) (ii).

be able to assume a responsible position in her children's lives. See *In re Eden F.*, supra, 250 Conn. 706. In support of her argument, the respondent refers to her success with her third child at Thames River, where she had resided since February, 2006.

In that regard, the court found that the respondent has a history of unstable housing. She had been referred to a domestic violence shelter as a result of the order of temporary custody in 2002. The respondent was dismissed from the shelter in late October, 2002, because she failed to supervise Ariana properly and compromised the shelter's safety by having continued contact with R. The department and the department of social services helped the respondent obtain a housing voucher from the Department of Housing and Urban Development, but the respondent failed to obtain housing before the voucher expired. The respondent was referred to Thames River in September, 2003, but her application was placed on inactive status when she became unemployed. The respondent's application was reactivated in February, 2004, but the respondent failed to perfect the application, and she again was placed on the inactive list in April, 2004. She was referred once more to Thames River, at her request, in January, 2005, but only entered the program in February, 2006.[5]

Although the court noted that the respondent has improved her child rearing abilities and that the department is not concerned about her ability to care for her third child while she is a resident of Thames River, the Thames River program is of limited duration. Eventually, the respondent must return to the community and demonstrate that she can be a safe, responsible and

[5] Following her referral, the respondent was placed on a waiting list for admission. The court found that the respondent was responsible for the time she spent on the waiting list.

nurturing parent while living on her own.[6] On the basis of her history of living in the community, the court considered it "foolhardy" to place the children who are the subject of the petitions for termination of parental rights with the respondent without appraising her ability to rear the children in the community. The court found by clear and convincing evidence that the respondent had failed to address her housing situation in a permanent, long-term manner. Furthermore, the court found by clear and convincing evidence that the respondent had failed to complete a parenting class by the start of trial.

"[E]ven if a parent has made successful strides in her ability to manage her life and may have achieved a level of stability within her limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, she could assume a responsible position in the life of her children." *In re Alejandro L.*, 91 Conn. App. 248, 260, 881 A.2d 450 (2005). The issue is not whether the parent has improved her ability to manage her life but whether she has gained an ability to care for the specific needs of her children at issue. See *In re Mariah S.*, 61 Conn. App. 248, 261, 763 A.2d 71 (2000), cert. denied, 255 Conn. 934, 767 A.2d 104 (2001). The court found that the needs of Anthony and Ariana are not the same as the needs of the respondent's third child, whom she cares for at Thames River.

The respondent also argues that the court's finding that she had failed to achieve rehabilitation was clearly erroneous because David M. Mantell,[7] a psychologist

---

[6] The respondent has a constellation of issues regarding her psychological, social and parenting limitations. In order to rehabilitate, the respondent must address all of the areas of concern, which the court found she has not done.

[7] Mantell testified at trial and submitted a report, after having examined the respondent in May, 2005. Mantell wrote that the respondent "is a significantly clinically involved person with a strongly debilitating family of origin experience and persistent relational and life dysfunctions throughout her adoles-

who evaluated the respondent and the children, recommended that she be provided an additional six months to achieve rehabilitation. She also argues that Mantell never recommended terminating her parental rights or not reunifying the children with her.[8] Neither argument is persuasive.

On May 11, 2005, Mantell undertook a relational assessment of the children, the respondent, R's mother and the children's foster parents. Mantell authored a psychological report of the assessment that is dated June 10, 2005. In that report, Mantell stated: "In a telephone report to [court service officer Linda] Sabatelli on June 7, 2005, I recommended that the [respondent] be given an additional six months to achieve rehabilitation and that the court require of her as preconditions for considering a return of the children that she show stable housing, stable employment, compliance with individual therapy, no legal or boyfriend problems, and I would certainly recommend that [she] be required during this period to show complete compliance with all court expectations including those that I may not have just enumerated. I also indicated that I thought the [respondent's] prognosis was poor because of the

cent and early adult years. She has had multiple dysfunctional relationships with men who fail to support her. Her behavior is self-defeating. She has not taken advantage of offered opportunities for rehabilitation. Her personality structure shows strong elements of dependency and self-defeating behaviors. She has only of late begun to attend to the basic requirements for reconciliation with her children though there has been abundant time for her to do this. . . .

"The [respondent] has a combination of clinical, relational, personality, financial, housing and, intermittently, also of legal problems that seem to effectively prevent her from minimally acceptable parenting. She remains immature, underdeveloped in her self-understanding, and still damaged by the poor care she experienced as a child that seems to interfere with her ability to recognize and fulfill parenting responsibilities."

[8] The respondent failed to direct us to the place in the record, either an exhibit or transcript of testimony, where we can review Mantell's alleged assertions. See Practice Book § 67-4. Our review of the record was guided by the petitioner's brief in response to the respondent's contentions.

length, severity and breadth of her difficulties." Mantell made his recommendation almost one year before trial. The court found by clear and convincing evidence that the respondent failed to comply with all court-ordered expectations. Mantell recommended compliance as a precondition of reuniting the children with the respondent. At trial, Mantell testified, pursuant to a hypothetical question propounded on the facts that existed in December, 2005, that the respondent "had not fulfilled her expectations, and she is actually not significantly more advanced toward fulfilling them than she was when I saw her and she's not prepared to provide a home for her children."

As to the respondent's argument that Mantell never recommended terminating the respondent's parental rights and did not recommend against reunifying the children with her, the respondent has failed to demonstrate to us that Mantell was asked to render an opinion as to those questions. We note that the court found by clear and convincing evidence that further reunification efforts were not appropriate.[9]

The respondent also argues that the court's finding that she had failed to achieve rehabilitation is clearly erroneous because she has a strong loving bond with her children.[10] The respondent relies on dicta in *In re Jessica M.*, 49 Conn. App. 229, 714 A.2d 64 (1998), appeal dismissed, 250 Conn. 747, 738 A.2d 1087 (1999),[11] to

[9] Furthermore, Judge Mack approved the permanency plan for the children that called for adoption, and the respondent never filed an appeal from that judgment. See *In re Kachainy C.*, 67 Conn. App. 401, 412, 787 A.2d 592 (2001) (final judgment).

[10] The court found that the children had a bond with the respondent, their foster parents and one another.

[11] *In re Jessica M.*, supra, 49 Conn. App. 229, is distinguishable on its facts. There the trial court found that the parents had intellectual and psychological limitations and had benefited from services provided by the department in the past. See id., 240; see also *In re Migdalia M.*, 6 Conn. App. 194, 202–203, 504 A.2d 533 (rehabilitation with regard to parents of limited intellectual ability and medically frail child), cert. denied, 199 Conn. 809, 508 A.2d 770 (1986).

support her position. "[T]o the extent the parents can demonstrate to [the child] that they care about her and love her, they have a responsible position in her life." Id., 240. The respondent claims that she has a responsible position in the lives of the children by virtue of her strong loving bond with them. The respondent's argument founders because she has multiple issues that prevent her from being a responsible parent to the children, such as failing to provide appropriate and reliable housing, failing to maintain employment and failing to keep them safe from R, who is abusive and has substance abuse problems, among other concerns.

For the foregoing reasons, we conclude that the court's finding that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief, that, within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives was not clearly erroneous.

II

The respondent's second claim is that the court's finding that it was in the best interests of both Anthony and Ariana to terminate her parental rights is clearly erroneous because she has a strong, loving bond with them and she is the only psychological parent they have. We do not agree.

If the court finds that the petitioner has proven by clear and convincing evidence that one of the statutory

The respondent also relies on language from *In re Vincent B.*, 73 Conn. App. 637, 645, 809 A.2d 1119 (2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003). The facts of that case also are distinguishable because the respondent father there voluntarily turned himself into a long-term, inpatient substance abuse treatment program for alcohol addiction, which he successfully completed along with counseling for anger management and depression. The respondent father remained sober at the time of trial on the petition to terminate his parental rights. Id., 642–44. Also, the respondent father had admitted himself to the substance abuse program prior to the commissioner's filing the petition for termination of his parental rights. Id., 642–43.

grounds for termination of parental rights exists, it must then determine "whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Sheena I.*, 63 Conn. App. 721; see *In re Valerie D.*, 223 Conn. 492, 511 & n.15, 613 A.2d 748 (1992). "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]." (Citation omitted; internal quotation marks omitted.) *In re Ryan R.*, 102 Conn. App. 608, 625–26, 926 A.2d 690, cert. denied, 284 Conn. 923, 924, 933 A.2d 724 (2007).

Pursuant to § 17a-112 (k)[12] the court found by clear and convincing evidence that the department provided

[12] General Statutes § 17a-112 (k) provides in relevant part: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered . . . (2) whether the Department of Children and Families has made reasonable efforts to reunite the family . . . (3) the terms of any applicable court order entered into . . . and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents . . . and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future . . . and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child . . . or by the economic circumstances of the parent."

The respondent does not challenge any of Judge Taylor's findings as to the factors enumerated in § 17a-112 (k).

services to the respondent in a timely, appropriate and comprehensive manner to facilitate reunification and made reasonable efforts to reunite her with her children. The respondent, however, failed to utilize the services provided in a timely manner and failed to gain appropriate benefit from the services in a timely manner. Her serious problems made her unable or unwilling to benefit from reasonable reunification efforts in a timely manner. The respondent had been informed of her deficits, and Judge Mack ordered that she needed to take specific steps to address her deficits. The respondent has failed to comply with most of the ordered steps. The respondent is not presently able or willing to benefit from reunification services as contemplated by the federal Adoption Assistance and Child Welfare Act of 1980, as amended. She also is unable or unwilling to make realistic and sustained efforts to conform her individual conduct to acceptable parental standards. Furthermore, the court found by clear and convincing evidence that no unreasonable conduct by the department, the foster parents, the office of adult probation or third parties prevented the respondent from maintaining a relationship with the children. Her economic circumstances also did not prevent her from maintaining relationships with them. The court acknowledged that the limitations and restrictions inherent in the foster care system were in effect.

The respondent argues that her parental rights should not be terminated because her children are bonded to her. The court found that there was a bond between the respondent and the children, who are ages seven years and three months, and five years and two months, and that the children enjoy visiting with her. The court also found that there was a bond between the children and their foster parents. "[O]ur courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best

interest to terminate parental rights." (Internal quotation marks omitted.) *In re Ryan R.*, supra, 102 Conn. App. 627.

The respondent also argues that Anthony has had a number of different foster parents in the two and one-half years he has been in the petitioner's custody, which demonstrates that there is no permanent place for him at this time and that her parental rights as to him should not be terminated. The court found that Anthony subverted his last therapeutic foster care placement because he accused the foster parents of abusing him. The expert testimony established that Anthony will continue to sabotage his foster care placements as long as he believes that he can return to the respondent. Foreclosing the prospect of his return to the respondent, therefore, will be a step to giving him the permanency he needs, rather than permitting him to languish in temporary foster care for years while the respondent attempts to achieve rehabilitation.

Importantly, the court found by clear and convincing evidence that the children cannot afford to wait any longer for the respondent to rehabilitate herself. The respondent has been given more than an ample amount of time to achieve rehabilitation. Although she has made some progress in understanding the children's special needs, it is not enough. The children cannot spare the respondent additional time to achieve rehabilitation. Before reunification could be contemplated, the respondent would have to complete the Thames River program, establish herself in the community and demonstrate that she can live there independently. According to the respondent, she expects to stay at Thames River until February, 2008, before she even attempts to establish herself in the community. She then must be given time to prove that she can function independently. The court found that Anthony and Ariana cannot wait that long for permanence.

Pursuant to the respondent's testimony, the court found that the respondent only has a minimal understanding of Anthony's behaviors and special needs. In the past, the respondent has shown an inability or an unwillingness to address or control Anthony's behavior and only recently has shown any improvement in this regard. The respondent does not believe that Anthony suffers from attention deficit hyperactivity disorder, and she completed a questionnaire for Mantell describing Anthony as normal, although moody and demanding. The court found by clear and convincing evidence that the respondent's parenting skills need to improve much more before it would be viable for her to be reunited with the children. By this time in the children's lives, a safe, nurturing and responsible parent should have a much better grasp of her children's needs and special needs.

The court also found that the respondent failed to address her housing situation appropriately. The only stable housing the respondent had during the pendency of the termination of parental rights proceeding was Thames River, which is not permanent. She has engaged in criminal conduct during the pendency of the case despite having been ordered to refrain from such conduct. She continues to have inappropriate contact with R, and the clear and convincing evidence is that she failed to take the necessary steps to assure her safety. Her judgment is also questionable with respect to relationships. She has given birth to a third child, whose father chooses not to have a relationship with the child.

Our appellate courts have recognized that "long-term stability is critical to a child's future health and development . . . ." (Citation omitted.) *In re Eden F.*, supra, 250 Conn. 709. "Because of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." *In re Alexander V.*, 25 Conn. App. 741, 748, 596 A.2d 934 (1991), aff'd, 223

Conn. 557, 613 A.2d 780 (1992). The court concluded, on the basis of the clear and convincing evidence, that Anthony and Ariana are entitled, without further delay, to an end to the uncertainty of whether they will be reunited with the respondent.

On the basis of our review of the record and the court's thorough and thoughtful memorandum of decision, we agree that, although the respondent loves her children and is bonded to them, the court properly found that she has failed to undertake the rehabilitative steps outlined for her or to take advantage of the services provided to her in a timely manner so that she could be reunified with the children. The best interests of the children call for permanency. Termination of the respondent's parental rights is, therefore, in the best interests of the children.

The judgments are affirmed.

In this opinion the other judges concurred.